283 N.J. Super. 331 (1995)
661 A.2d 1314
E.I. DU PONT DE NEMOURS AND COMPANY AND THE GENERAL ELECTRIC COMPANY, APPELLANTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 1995.
Decided August 1, 1995.
*337 Before Judges DREIER, WEFING and BRAITHWAITE.
Michael L. Rodburg argued the cause for appellants (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Mr. Rodburg, Richard F. Ricci, Robert L. Glicksman, Michael David Lichtenstein and Nelson D. Johnson, on the brief).
Eileen P. Kelly, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Kelly, on the brief).
The opinion of the court was delivered by BRAITHWAITE, J.S.C. (temporarily assigned).
*338 Appellants, E.I. du Pont de Nemours and Company and The General Electric Company, appeal from the adoption by the Department of Environmental Protection[1] (DEP) of amendments to N.J.A.C. 7:26B (Administrative Consent Orders) and a new regulation, N.J.A.C. 7:26C (Department Oversight Of The Remediation Of Contaminated Sites). On April 6, 1992, DEP published for public comment proposed amendments to N.J.A.C. 7:26B and a new regulation known as N.J.A.C. 7:26C. The disputed regulations were promulgated under DEP's authority given in the Solid Waste Management Act, N.J.S.A. 13:1E-1 to -207; the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to -35, now the Industrial Site Remediation Act (ISRA); the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.12; the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -60; and N.J.S.A. 58:10A-21 to -37, which regulates the underground storage of hazardous material. Appellants and many others commented on the proposed regulations. On May 17, 1993, DEP published the adopted regulations. This appeal followed.
According to DEP, the regulation changes were needed in part because its past practice of "addressing the worst environmental cases first," often "discouraged private parties from addressing the contamination at sites of lower priority in terms of environmental severity." Given what it termed "economic" and "business factors," DEP had routinely been requested "to respond with oversight and approval of cleanups of contaminated sites" different from its own environmental priorities. In an effort to respond to this need, DEP sought to "institutionalize [through the proposed regulations] a new initiative to enable a variety of factors to influence the timing of contaminated site cleanup."
*339 The cornerstone of DEP's new approach was the introduction of various oversight documents. The oversight documents are a Memorandum of Agreement (MOA), an ECRA consent order, and a Responsible Party Administrative Consent order (RP-ACO). The various oversight documents allow a party to perform remediation and obligate it to pay DEP's review and oversight costs, in return for DEP's promise to review and comment on submissions within specific time frames. DEP's oversight costs are calculated according to the "oversight cost formula," set forth in the regulations.
Appellants challenge many provisions of the regulations, but essentially they assert that there is no legislative authorization for DEP to collect oversight fees, and the "oversight cost formula" is arbitrary, capricious and therefore invalid. Appellants contend that neither the Spill Act nor the Water Pollution Control Act authorizes the oversight fees envisioned by DEP. Their position is that neither act refers to any "oversight" by DEP or permits the extent of oversight fees that DEP's regulations impose for monitoring parties' cleanups of their own sites, and that the Spill Act authorizes "no fee imposition and collection authority whatsoever."
DEP's position is that the Spill Act both expresses and implies the broad grant of power to it to require oversight cost reimbursement as the price of a party obtaining DEP's supervision in cleaning up a site. DEP asserts that the oversight fees are geared to a private party's request to perform its own remediation of a site and DEP's resultant costs in insuring that the remediation is properly performed.

I

The Authority Of DEP To Engage In Oversight In The Remediation Of Contaminated Sites
An agency regulation is "presumptively valid," and therefore the party challenging it bears the burden of proving its *340 invalidity. Medical Soc'y v. Dep't of Law & Pub. Safety, 120 N.J. 18, 25, 575 A.2d 1348 (1990). The presumption of validity follows if the regulation is within the authority delegated to the agency and is not on its face beyond the agency's power. Ibid. In considering the grant of authority, courts look to the "fair contemplation" of the delegation of the enabling statute. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-62, 384 A.2d 795 (1978). And while a regulation cannot "alter the terms of a statute or frustrate the legislative policy," courts place great weight on the interpretation of legislation by the administrative agency enforcing it. Medical Soc'y, supra, 120 N.J. at 25-26, 575 A.2d 1348.
In deciding whether a particular regulation is statutorily authorized, a court "may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives." New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795. In this manner the court considers whether the requisite authority is implied, if not expressed. Ibid. Furthermore, declarations of public policy in enabling legislation can serve as sources of statutory authorization for regulations aimed at pursuing that policy. In Review of Health Care Admin. Bd. v. Finley, 168 N.J. Super. 152, 162, 402 A.2d 246 (App.Div. 1979), aff'd, 83 N.J. 67, 415 A.2d 1147, cert. denied, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980). This is especially true where policy is expressed in broad terms. Ibid.
We are satisfied that DEP's power to enter into agreements, to issue orders, and to monitor compliance with any directives is clearly expressed in the Spill Act, which provides as follows:
Whenever any hazardous substance is discharged, the department may, in its discretion, act to clean up and remove or arrange for the cleanup and removal of such discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, such discharge. If the discharge occurs at any hazardous or solid waste disposal facility, the department may order the facility closed for the duration of the cleanup and removal operations. The department *341 may monitor the discharger's compliance with any such directive. Any discharger who fails to comply with such a directive shall be liable to the department in an amount equal to three times the cost of such cleanup and removal, and shall be subject to the revocation or suspension of any license or permit he holds authorizing him to operate a hazardous or sold waste disposal facility.
[N.J.S.A. 58:10-23.11f.a(1).]
We find that the MOAs that are envisioned by the regulations are authorized by the statutory language permitting DEP to "arrange for the cleanup and removal of, such discharge." N.J.S.A. 58:10-23.11f.a(1). Moreover, ISRA, supra, recognizes DEP's authority to condition a party's remediation upon its entering into a MOA. See N.J.S.A. 58:10B-15.
Likewise, a RP-ACO is authorized by the provision permitting DEP to "direct the discharger to clean up and remove, or arrange for the cleanup and removal of, such discharge." N.J.S.A. 58:10-23.11f.a(1). In addition, N.J.S.A. 58:10-23.11f.a(1) expressly empowers DEP to "monitor the discharger's compliance with any such directive." Ibid. Moreover, ISRA, supra, expressly recognizes DEP's "oversight," in certain cases, of a private party's remediation, and also recognizes the use of a RP-ACO to accomplish the remediation of hazardous sites. N.J.S.A. 58:10B-3a.

II

The Authority Of DEP To Collect Oversight Fees
Despite the above language, appellants contend that nothing in the statutes authorizes DEP to collect from participants its costs of overseeing the participants' site remediation. We agree with appellants that the Spill Act does not expressly provide for DEP to collect its oversight costs from those entering into agreements or orders with DEP to remediate. However, if such a power is implied, it is just as effective as if it had been expressed. New Jersey Guild of Hearing Aid Dispensers, supra, 75 N.J. at 562, 384 A.2d 795. We find that several statutes imply such a power. For example, under N.J.S.A. 58:10-23.11g.c(1):

*342 Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to subsection b. of section 7 of P.L. 1976, c. 141.... ([N.J.S.A.] 58:10-23.11f).
[Ibid.]
It is appellants' position that DEP's oversight costs are not "cleanup and removal costs," but rather administrative expenses incurred to oversee another's remediation. The term "cleanup and removal costs" is broadly defined as follows:
"Cleanup and removal costs" means all costs associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources, and shall include costs incurred by the State for the indemnification and legal defense of contractors pursuant to sections 1 through 11 of P.L. 1991, c. 373 (C. 58:10-23.11f8 through et seq.)
[N.J.S.A. 58:10-23.11b.d.]
The definition of cleanup and removal costs is broad and consistent with "the broad authority granted the Department under the Spill Act and under the Department's own authorizing legislation[.]" In re Kimber Petroleum Corp., 110 N.J. 69, 75, 539 A.2d 1181 (1988). We, therefore, conclude that the costs of DEP's oversight of a particular remediation would necessarily be included within "all costs associated with a discharge, incurred by the State ... with written approval from the department in the ... removal or attempted removal of hazardous substances[.]" N.J.S.A. 58:10-23.11b.d.
Similarly, the Water Pollution and Control Act incorporates broad language that we interpret to grant authority to DEP to collect its oversight costs from parties whom they oversee in remediating a discharge. For example, under N.J.S.A. 58:10A-10 ("Violations; remedies, fines and penalties; enforcement; forfeiture of conveyances"), DEP has numerous remedies available to it, *343 including the ability to assess against a polluter certain of its costs engendered by a discharge. N.J.S.A. 58:10A-10c provides in pertinent part as follows:
c. The commissioner is authorized to commence a civil action in Superior Court for appropriate relief for any violation of this act or of a permit issued hereunder. Such relief may include, singly or in combination:
(1) [I]njunction[s];
(2) Assessment of the violator for the reasonable costs of any investigation, inspection, or monitoring survey which led to the establishment of the violation, and for the reasonable costs of preparing and litigating the case under this subsection;
(3) Assessment of the violator for any reasonable cost incurred by the State in removing, correcting or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which the action under this subsection may have been brought;
(4) Assessment ... of compensatory damages;
(5) Assessment ... [for] economic benefits ... [the violator received from the violation].
[The subsection concludes by setting forth to whom assessments shall be paid.]
[Ibid.]
Although it is true, as appellants note, that N.J.S.A. 58:10A-10c expressly applies to damages recoverable in a "civil action," the provisions thereof, nonetheless, evince the Legislature's willingness to permit DEP to assess a polluter for DEP's "reasonable costs of ... investigation, inspection or [preparing a] monitoring survey" resulting in the uncovering of a violation. N.J.S.A. 58:10A-10c(2). In addition, the same statute authorizes DEP to assess "the violator for any reasonable costs incurred by the State" in correcting water pollution resulting from "any unauthorized discharge of pollutants[.]" N.J.S.A. 58:10A-10c(3). Likewise, where a party enters into a MOA or RP-ACO under the Site Remediation regulations, it is acknowledging its responsibility to clean up a discharge. We are convinced that DEP's costs in overseeing the party's remediation efforts, therefore, are not, as a matter of principle, much different from the costs DEP could seek to have a court impose upon a party pursuant to N.J.S.A. 58:10A-10c. In either case, the responsible party is paying for DEP's necessary involvement in correcting the pollution. And, as we *344 note infra, DEP's calculation of oversight fees is subject to challenge by the responsible party in an enforcement proceeding commenced by DEP.
Finally, on this point, we note that DEP has been collecting its oversight fees from responsible parties since 1986 without "legislative interference." See Malone v. Fender, 80 N.J. 129, 137, 402 A.2d 240 (1979) ("an agency's construction of a statute over a period of years without legislative interference will under appropriate circumstances be granted great weight as evidence of its conformity with the legislative intent").

A. The Nature Of The Oversight Fees
Appellants next maintain that the Spill Act and Water Pollution Control Act must be read narrowly, prohibiting DEP from levying the oversight fees it charges in order that the legislation not run afoul of the separation of powers doctrine. They claim that the so-called oversight "fees" are in fact nothing less than a tax, the proceeds from which are used to support DEP expenses generally. Appendix I of N.J.A.C. 7:26C sets forth the "oversight cost formula" as follows:
Administrative Cost Recovery Formula = A + B as detailed below.
A. Case Management Team Staff members  including case managers, geologists, technical coordinators, samplers, inspectors, supervisors, section chiefs, etc.  who have coded to the site-specific project activity code (PAC) reflecting direct hours worked on the case. Actual hours and salaries for all staff members using the specific PAC will be included in the formula calculations.
(Sum of Coded hours x hourly rates) x 1.22 additive factor x 1.2865 fringe benefit factor x 2.3424 indirect cost factor = A)
B. Direct Costs
Represents any non-salary direct site-specific costs such as laboratory analysis contractor expenses, etc. These costs will be billed directly to the responsible party as a formula add on. Direct Costs = B.
[Ibid.]
In general, "taxes" are "annual, recurring, pecuniary burdens imposed by legislative authority upon individuals or property to support government." Efros v. Russo, 68 N.J. Super. 110, 112, 171 A.2d 370 (Law Div. 1961), rev'd on other grounds, 71 N.J. Super. 602, 177 A.2d 565 (App.Div. 1962). Taxes are used to defray *345 ordinary government expenses in promoting the general welfare. Ibid. In contrast, "a fee is imposed under the government's police power to regulate." New Life Gospel Church v. Dep't of Community Affairs, 257 N.J. Super. 241, 246, 608 A.2d 397 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1136 (1992). "A fee is not judged a tax so long as the amount of the fee bears a reasonable relationship to the cost incurred by the government to regulate." Ibid.
In the case of licenses, the Legislature may "delegate to a regulative administrative agency the authority to impose a license fee to defray the costs of review of applications and of regulation and control providing the delegation is with sufficient guidelines and standards." Atlantic City Casino Hotel v. Casino Control Comm'n, 203 N.J. Super. 230, 236-37, 496 A.2d 714 (App.Div.), certif. denied, 102 N.J. 326, 508 A.2d 205 (1985). Whether or not the standards are sufficient depends upon the "entire enabling act, its surroundings and objectives." Id. at 237, 496 A.2d 714.
Appellants argue that the oversight cost formula is "openly a device to raise revenue, not a fee to recover out-of-pocket expenses." They contend that the oversight costs include reimbursement for expenses that are unrelated to DEP's actual costs at a particular site.
As noted above, the challenged formula consists of two components: Part "A" ("Case Management Team" expenses), and Part "B" ("Direct Costs"). The crux of appellants' argument is that it is impermissible for DEP to charge a party for some portion of these general "overhead" or indirect expenses even if that "portion" is based on or prorated to the specific time DEP spent overseeing that party's remediation.
DEP's recovery of its total costs of regulating a program through fees is not new. Public Serv. Elec. & Gas v. N.J. Dep't of Envtl., 101 N.J. 95, 501 A.2d 125 (1985). Without calling into question the fact that DEP's fee schedule was based on a budget that included various "overhead costs," the Court noted the following:

*346 This budget figure reflects the costs of processing NJPDES surface-water permits and managing the permit program; it includes salaries, fringe benefits, indirect costs mandated by the Department of Treasury, printing and office supplies, data processing, professional services, and maintenance and rental of equipment and vehicles.
[Id. at 102 n. 3, 501 A.2d 125.]
The Court concluded that because the Water Pollution Control Act is not a "revenue-raiser," DEP's regulatory power included the "right to charge fees designed to defray costs as long as such fees do `not "exceed the bounds of reason considered in connection with the service and the cost of the service granted."'" Id. at 104, 501 A.2d 125 (quoting Moyant v. Borough of Paramus, 30 N.J. 528, 546, 154 A.2d 9 (1959)).
Admittedly, Public Serv. Elec. & Gas, supra, involved an express grant of authority by the Legislature to collect a fee. However, the fact that that power is implied rather than expressed does not make it any less effective. See Matter of Certain Amendments, 133 N.J. 206, 216, 627 A.2d 614 (1993) ("The absence of an express statutory authorization will not preclude ... [DEP] from acting where `by reasonable implication, that action can be said to promote or advance the policies and findings that served as a driving force for the enactment of that legislation.'" Ibid.) (quoting Mastrangelo, Inc. v. Comm'r. of Dep't of Envtl. Protection, 90 N.J. 666, 683-84, 449 A.2d 516 (1982)).
The DEP's oversight regulations promote the legislative goal of prompt, thorough and monitored pollution remediation, with the cost of same being borne by the responsible party. Thus, to the extent that the oversight formula includes a party's prorated share of employee benefits or other overhead expenses, as long as the formula is reasonably related to the service granted, it does not constitute a tax.

III

The Formula For Calculating DEP's Oversight Fees
Appellants next contend that even if DEP has the statutory authority to recover its oversight costs from a particular responsible *347 party, its methodology for assessing its costs is flawed. Specifically, they claim that: (A) the salary additive factor charges parties for excessive down time; (B) the fringe benefit factor should be added to, not multiplied by, indirect costs; and (C) the indirect cost factor includes "general" DEP expenses not related to a specific site.
The oversight cost formula includes the direct hour charges of those working on the project times a twenty-two percent additive factor for down time such as vacations, administrative leave, and training; a 28.65 percent fringe benefit factor; and an additional 134.24 percent indirect cost factor for costs incurred for common or joint purposes and not readily assignable, such as expenses of the commissioner and other senior personnel, building rent and central services.

A. Salary Additive Factor
After a review of the record, we are satisfied that DEP has never explained what went into its additive factor figure. The only explanation was that an average of the Department's "down time" was calculated at twenty-two percent. However, we cannot determine how many hours each year DEP employees are in training, or out on sick leave. Moreover, we cannot determine if the factor is based on actual statistics, or the average DEP employee, or all DEP employees. Although DEP has explained in principle what considerations make up the salary additive factor, it has failed to support its explanation with reference to particular figures or statistics. There is no substantial evidence in the record to support the findings of a twenty-two percent additive factor. Public Serv. Elec. & Gas, supra, 101 N.J. at 103, 501 A.2d 125. Thus, we remand this issue to DEP to adequately document its twenty-two percent additive factor, or any subsequent salary additive factor.

B. Fringe Benefit Factor
Appellants also argue that the product of coded hours multiplied by hourly rates, multiplied by the salary additive factor, *348 multiplied by the fringe benefit factor, should be added to, not multiplied by, the product of coded hours multiplied by hourly rates, multiplied by the indirect cost factor. They assert that fringe benefits relate to salary, not indirect costs such as rent or supplies. By multiplying rather than adding the indirect cost factor, they claim DEP has increased its cost recovery from 2.53 times direct salary costs to 3.085 times those costs.
As DEP explained in its proposed regulations, the fringe benefit factor included charges for pension, health, prescription drug, dental, worker's compensation, temporary disability insurance and unused sick leave benefits. It also included the "employer's share" of FICA taxes. These components, as appellants correctly point out, all relate to salary or personnel costs. The same is true with respect to the components of the salary additive factor, addressed above.
However, the indirect cost factor expressly includes such non-personnel-related expenses as "building rent" and "various indirect non-salary costs." While the indirect cost factor also includes some salary-related components  such as "indirect salaries"  the fact that it also includes non-salary related components makes multiplying the indirect cost factor by the salary additive and fringe benefit factors inappropriate. An increase in "down time" does not result in an concomitant increase in indirect non-salary costs such as rent. The record does not support DEP's multiplying both the salary additive and fringe benefit factors by the indirect cost factor. Public Serv. Elec. & Gas, supra, 101 N.J. at 103, 501 A.2d 125. We hold that the product of coded hours multiplied by hourly rates, multiplied by the salary additive factor, multiplied by the fringe benefit factor, must be added to, not multiplied by, the product of coded hours multiplied by hourly rates, multiplied by the indirect cost factor, rather than multiplied as DEP has sought to do.

C. Indirect Cost Factor
Appellants next argue that the indirect cost factor improperly includes a share of the salary of personnel not coded to a *349 particular site and other non-salary costs. Appellants do not assail the methods by which DEP calculates the different components of the indirect cost factor formula, or the methods by which DEP insures that the different components are properly weighted to reflect the portion of indirect costs DEP determines are allocable to a particular oversight cleanup. Rather, their objection is with the very inclusion within the formula of such indirect cost components.
On at least two prior occasions, our Supreme Court has given approval to an agency's taking into consideration the kinds of overhead expenses involved here in setting its regulatory fees. See Public Serv. Elec. & Gas, supra. Similarly, in State Farm Mut. Auto v. Public Advocate, 118 N.J. 336, 571 A.2d 957 (1990), where the issue was the bill of the Division of Rate Counsel when representing the public in a rate proceeding, the Court recognized the relationship of "overhead" costs to the Rate Counsel's activities in a given case:
On this score, we add a word about the specifics of the [judicial] review [of Rate Counsel's bills] prompted by these cases. Obviously, the level of funding must encompass the overhead expenses attributable to Rate Counsel's activities. Without secretaries and office equipment and a supervisory lawyers' office, no governmental law office can function.
[Id. at 353, 571 A.2d 957.]
We are satisfied that DEP properly included within the indirect cost factor a share of the salary of personnel not coded to a particular site and other non-salary costs.

IV
The Power Of DEP To Prescribe The Terms Of The RP-ACO
Appellants next contend that DEP was not granted power to issue or prescribe terms of the RP-ACO by its enabling legislation, the Water Pollution Control Act, the Solid Waste Management Act, the Spill Act or ECRA. They assert that by using a RP-ACO to "obtain consent to that which it cannot compel," DEP is defining the "scope and extent of its own powers."
*350 DEP claims that the power to require a responsible party to enter into an administrative consent order before allowing a priority cleanup is within the scope of its delegated powers. It argues that the power to enter into and require such consent orders is implied in the Spill Act and its enabling legislation in order to accomplish the legislative goals of "pollution prevention and remediation."
In proposing the administrative consent order mechanism, DEP acknowledged that certain parties had already likened the mechanism to a situation where a responsible party signs a "blank check" to DEP. That criticism was based on a party's reluctance to agree to provide all necessary cleanup at a site before DEP makes specific decisions as to the extent of necessary cleanup. DEP explained, however, that the task of cleaning up contaminated sites in New Jersey was a "major undertaking," and if it "were [sic] to expend its limited resources on multiple and protracted negotiations with the responsible parties for each individual site, ... [DEP] would be wasting resources as well as significantly increasing the time involved in cleaning up each site." 24 N.J.R. 1284 (April 6, 1984). It noted that of the more than 1250 national priority sites in the country, over 100 were in New Jersey.
"Normally courts defer to the procedure chosen by the agency in discharging its statutory duty." In re Solid Waste Util. Cust. Lists, 106 N.J. 508, 519, 524 A.2d 386 (1987). Subject to due process safeguards and the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -21, an agency has discretion in establishing appropriate procedures to enable it to implement legislative policy. Ibid.
In the case of the Spill Act, our Supreme Court has previously determined that the Act conferred "no right on the regulated public to participate in the cleanup procedures developed by ... [DEP]." Woodland Private Study Group v. State, 109 N.J. 62, 75, 533 A.2d 387 (1987). The decision as to whether DEP allows the "regulated public" to participate in clean-up *351 procedures "remains within the sound discretion of DEP." Id. at 76, 533 A.2d 387.
DEP has exercised its discretion to allow the regulated public to participate in clean-up procedures by implementing the administrative consent order procedure in general, and the RP-ACO procedure in particular. Moreover, its explanation for utilizing administrative consent orders in priority cases  conserving resources that would otherwise be spent in multiple, protracted negotiations with each responsible party  we find to be reasonable. Public Serv. Elec. & Gas, supra, 101 N.J. at 103, 501 A.2d 125.
We conclude that DEP has the power to issue the subject RP-ACOs. First, the settlement of potential litigation ranks high as a matter of public policy. Jannarone v. W.T. Co., 65 N.J. Super. 472, 476, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961). For example, courts generally favor consent judgments. Manczak v. Dover Tp., 2 N.J. Tax, 529, 533 (Tax Ct. 1981), overruled on other grounds, 188 N.J. Super. 500, 457 A.2d 1220 (App.Div. 1983). Such judgments represent "an agreement of the parties" which operates as an adjudication between them as to the issues represented by the judgment. Regan v. Regan, 246 N.J. Super. 473, 477-78, 587 A.2d 1330 (Ch.Div. 1990). Because of the "pronounced similarities in the exercise of judicial and quasi-judicial powers, ... court-fashioned doctrines for the handling of litigation do in fact have some genuine utility and relevance in administrative proceedings[,]" and in applying such mechanisms one should consider "an administrative agency's statutory foundations, its executive nature, and its special jurisdictional and regulatory concerns." City of Hackensack v. Winner, 82 N.J. 1, 29, 410 A.2d 1146 (1980). Thus, we are satisfied that recognition of DEP's power to enter into RP-ACOs with those parties responsible for a discharge in order to expedite cleanup comports with considerations of public policy.
Second, there is no question that DEP may issue administrative orders generally. See, e.g., Woodland Private Study Group, *352 supra, 109 N.J. at 65, 533 A.2d 387 (the Court noted, without questioning, the authority of DEP having issued an administrative order forbidding "responsible parties" from conducting remedial investigation or feasibility studies of a possible contaminated site). Moreover, N.J.S.A. 58:10B-3a provides that a "person in anyway responsible for a hazardous substance who has ... entered into an administrative consent order with a State agency ... shall establish ... a remediation funding source...." Ibid. Furthermore, under the New Jersey Administrative Procedure Act, an agency is generally free to dispose of a contested case through a "consent order." N.J.S.A. 52:14B-9(d).
Third, in State, Dep't of Envtl. Protection v. Mobil Oil, 246 N.J. Super. 331, 337, 587 A.2d 657 (App.Div. 1991), we recognized DEP's authority to enter into agreements with responsible parties when we said "that DEP has the right to confront the alleged polluter with Spill Act violations, propose remediation and cleanup, and then enter into a voluntary, consensual agreement to enable the alleged polluter to proceed with clean-up." Ibid.
As noted earlier, under N.J.S.A. 58:10-23.11f.a, DEP has discretion as to whether it will clean up a site, direct a discharger to perform the cleanup, or permit a third party to do the cleanup. But there is no "private right" under the statute to participate in a cleanup. Woodland Private Study Group, supra, 109 N.J. at 76, 533 A.2d 387. Thus, in creating such a right DEP may prescribe reasonable requirements limiting that right. If a responsible party chooses not to enter into such an agreement, it may do so. But the Legislature, and not DEP, has made a "person who has discharged a hazardous substance ... strictly liable for all cleanup and removal costs." Id. at 75, 533 A.2d 387.

A. Excessive Discretion Of DEP
Appellants next urge that the RP-ACO empowers DEP with excessive discretion by forcing the responsible party to commit to all cleanup and oversight costs in "blank check" form at a time when even DEP does not know the extent of the costs. They also *353 challenge the regulation's requirement that, in entering into a RP-ACO, a party surrenders its right to challenge DEP decisions in the matter. They contend that such obligations placed on a responsible party "create inefficiencies" in DEP because they allow DEP to run boundless in its oversight activity, and also unfairly force the party to agree to spend money "without vaguely understanding the nature of that commitment."
Although administrative discretion is limited by the declared legislative policy and the means provided by the lawmakers toward that end, it is nonetheless "inclusive of such authority as is by fair implication and intendment incident to the agency's essential function and purpose[.]" Swede v. City of Clifton, 22 N.J. 303, 312, 125 A.2d 865 (1956). An administrative agency's peculiar knowledge may increase the latitude given it in exercising its delegated discretion. See Bove v. Bd. of Adjustment of Emerson Borough, 100 N.J. Super. 95, 102, 241 A.2d 252 (App.Div. 1968) (where we, in affirming the action of a local board of adjustment, stated that "public bodies because of their peculiar knowledge of local conditions must be allowed wide latitude in their delegated discretion").
While it is true that the form of RP-ACO requires a responsible party to commit, at the beginning of the remediation process, to paying the costs of cleanup including DEP's oversight fees, the statute expressly empowers DEP to either clean up the site or have it cleaned up, the expenses for which the responsible party is then liable. N.J.S.A. 58:10-23.11q. Thus, a responsible party is liable for cleanup costs whether or not it enters into a consent order with DEP.
Although in a given case the party does not know at the outset how much DEP will ultimately charge it for remediation oversight, realistically, neither does DEP. Nevertheless, the oversight fee formula to be used in calculating such costs is a matter of record, and is tied directly to the responsible party's share of DEP's costs in overseeing that particular cleanup.

*354 B. Responsible Party's Right To Challenge DEP's Decision
We do not agree with appellant's assertions that the RP-ACO "requires that the ... [responsible] party relinquish any semblance of a right to challenge the reasonableness, necessity, or technical basis for ... [DEP's] decisions." The RP-ACO preserves all of the responsible party's defenses except as specifically provided in the RP-ACO. N.J.A.C. 7:26C-5.4. If DEP brings a civil action based on the RP-ACO, the party may raise any defense, including a defense that a DEP decision made pursuant to the RP-ACO was arbitrary, capricious or unreasonable. The party admits only such liabilities or facts with respect to the site as are set forth in the RP-ACO. Ibid. The significant "rights" which the party expressly waives under the RP-ACO are the right to contest DEP's jurisdiction or authority to issue the RP-ACO, and the right to contest the terms of the RP-ACO except where DEP brings an action to enforce the RP-ACO. However, a responsible party's right to contest arbitrary DEP action is preserved. While it must agree "up front" to pay the remediation costs, as a responsible party it would be liable for such costs anyway. N.J.S.A. 58:10-23.11q.
We are satisfied that where a responsible party chooses to remediate its own discharge, DEP may require it to agree in advance to pay the costs of cleanup and DEP's oversight. However, should the party later have reason to conclude that DEP's calculations of costs are unreasonable, it may refuse to pay those costs, and if DEP initiates an action against it thereafter, raise its defenses at that time. In enforcing the RP-ACOs in this manner, DEP is not exercising excessive discretion, it is not unfairly compelling responsible parties to forego their "day in court," and it is not acting arbitrarily, capriciously or unreasonably.

V

The Penalty Provisions Of The RP-ACO
Appellants further contend that the RP-ACO is invalid because it contains penalty provisions violative of the Spill Act. *355 Specifically, they say that the RP-ACO penalty provisions "provide none of the procedural safeguards" in the Spill Act, including: notice that stipulated penalties are beginning to accrue; the option to challenge the assessment of penalties; and the opportunity to pay the penalties under protest and seek a refund on the ground that the assessment was invalid. We disagree.
First, the form RP-ACO as adopted expressly provides that by entering into a RP-ACO, a responsible party preserves all defenses under the Spill Act, Kimber, supra, 110 N.J. at 86, 539 A.2d 1181, and "their amendments, supplements and progeny[.]" N.J.A.C. 7:26C, Appendix C, § XIII, para. 7. Second, a responsible party's good cause defenses are also available if DEP chooses to prosecute the stipulated penalties provisions in a given enforcement action. See State, Dep't of Envtl. Protection, supra, 246 N.J. Super. at 336, 587 A.2d 657 (where we noted that we disagreed with DEP's contention that "so-called Kimber defenses are just not available" in a challenge to stipulated penalties, stating that it "cannot concede such power to DEP under this legislative scheme, especially if the power is used arbitrarily and capriciously").
Third, in the context of a civil matter, constitutional rights may be waived if done so knowingly and deliberately. State v. Morgenstein, 147 N.J. Super. 234, 238, 371 A.2d 96 (App.Div. 1977). The hallmark of adequate notice involves "such notice as is in keeping with the character of the proceedings and adequate to safeguard the right entitled to protection." State v. Standard Oil Co., 5 N.J. 281, 305, 74 A.2d 565 (1950), aff'd, 341 U.S. 428, 71 S.Ct. 822, 95 L.Ed. 1078 (1951). Here, a responsible party has advance notice  before entering into the RP-ACO  of what would constitute violations and the amount of penalties applicable. Moreover, the per diem penalties are less than those authorized by the Spill Act. See N.J.S.A. 58:10-23.11u. Should a responsible party elect not to pay a stipulated penalty, it has an opportunity to challenge the penalty if DEP initiates any action to collect. While it is true that the regulations do not provide for advance notice of a breach *356 of the provision of the RP-ACO that DEP contends in a given case entitles it to the stipulated penalties, nonetheless, "[a]dvance notice of a ... penalty assessment is not necessary so long as the subject is afforded an opportunity to present his defenses to a competent tribunal before ... [the assessment] is collected or the order to pay becomes irrevocable." Community Affairs Dep't v. Wertheimer, 177 N.J. Super. 595, 599, 427 A.2d 592 (App.Div. 1980).
Fourth, given the express wording of the act's penalty section, we conclude that the Legislature did not mean to foreclose such additional penalty provisions as stipulated penalties as set forth in the regulations. The "[u]se of any remedy specified in this section shall not preclude use of any other remedy." N.J.S.A. 58:10-23.11u.a(1)(c). Generally, the "existence of a penalty section in a statute is ... strong evidence of the Legislature's intent to deter violations." State, Dep't of Envtl. Protection v. Lewis, 215 N.J. Super. 564, 575, 522 A.2d 485 (App.Div. 1987). By the stipulated penalty provisions, DEP expressly seeks to deter violations of any RP-ACO and to insure the remediation of contaminated sites.
The appellants' claim that the RP-ACO violates their right to advance notice is not persuasive. By entering into a RP-ACO, the party receives notice of "the rules of the game," and will have the right to challenge DEP's assessment of penalties in any subsequent enforcement action brought by DEP.

VI

The Good Cause Defenses
Appellants next urge that the challenged regulations impermissibly restrict the "good cause" defenses that our Supreme Court has previously recognized as implied in the Spill Act, referring to Kimber, supra, 110 N.J. at 86, 539 A.2d 1181. They contend that the oversight regulations' standard of "an objectively reasonable basis" for not complying with a directive neglects to take into consideration that "later developed" evidence could be invaluable to a party who in good faith refuses to comply with a directive. *357 Thus, they assert that such a standard operates to deny them due process in the face of the treble-damages threat of the oversight rules.
Under the oversight regulations, when a party receives a directive, it can (1) fully comply (N.J.A.C. 7:26C-2.5(g)1); (2) make a payment toward mitigation, but not otherwise comply (N.J.A.C. 7:26C-2.5(g)2); or (3) not comply (N.J.A.C. 7:26C-2.5(g)3). In the case of choosing either not to comply at all or not to comply but to offer partial remediation, the party must follow the procedure outlined in N.J.A.C. 7:26C-2.5(h) which says:
If the directive recipient chooses to pay in mitigation of its liability under a directive or not to comply with a directive, the directive recipient shall submit a written response to the Department according to the requirements in the directive.
1. The directive recipient shall include in the response a detailed explanation of the recipient's reasons for its decision, including all good cause defenses therefore [sic]. These written reasons will serve both to enable the Department to consider the recipient's contentions as to liability and to establish the nature and extent of any good cause defenses to treble damages.
2. The defenses the directive recipient includes in its written response to the directive will establish the good cause defenses to treble damages which the directive recipient may raise in a subsequent action by the Department to enforce the directive. The Department will rely on such defenses raised in a timely manner in its decision to proceed with public funds to remove or arrange for the removal of the discharge.
[Ibid.]
When our Supreme Court initially examined the due process implications of N.J.S.A. 58:10-23.11f.a(1), it noted that the statute, as written, "states that the only choice a company has when faced with a DEP directive is compliance or treble damages." Kimber, supra, 110 N.J. at 78, 539 A.2d 1181. Nevertheless, the Court said that due process concerns "arguably call for a right to challenge the validity of a legislative or administrative order without facing the possibility that one will incur a greater penalty if such challenge is unsuccessful than the loss resulting from such an order if left unchallenged." Id. at 80, 539 A.2d 1181. Although the Court addressed different kinds of "good-cause defenses" that might be available under the Spill Act, it did not stipulate that such defenses need be "known" as of a certain time in order to be available. Id. at 84-87, 539 A.2d 1181.
*358 Appellants fault the oversight regulations for preventing them from asserting, as a defense to treble damages, a defense based in part or in whole on evidence not obtained until after the party initially responds to a directive. While the applicable portion of the regulations require that in order to be successful the party's good-faith defense must be based as of "the time required to respond to the directive," the Kimber Court made clear that courts will "consider all the circumstances" before allowing DEP to recover treble damages in an enforcement action.
The Court said:
A good-cause defense is relevant only once a company refuses to comply with a DEP directive and DEP moves in court to enforce the directive.... If the court determines that a company's basis for non-compliance is objectively reasonable, even if the court does not ultimately uphold the company's argument, DEP's request for treble damages may be rejected if not reasonable in light of all the circumstances.
[Kimber, supra, 110 N.J. at 84, 539 A.2d 1181.]
Thus, notwithstanding any wording of the regulation to the contrary, the "all of the circumstances" language of Kimber, supra, must be read into the oversight regulations. We hold that the regulations must be interpreted to allow a party to assert later developed evidence or evidence coming to light after a party initially responded to a directive, and to rely on such evidence in asserting a "good cause" defense in refusing to continue complying with a directive. This interpretation comports with due process requirements. As we stated in Avon Products v. New Jersey DEP, 243 N.J. Super. 375, 579 A.2d 831 (App.Div. 1990), "[t]he relevance of Kimber is to be found not in its holding that judicial review is unavailable until an enforcement proceeding is brought, but in its larger concerns that due process values not be overlooked, even in environmental litigation." Id. at 379, 579 A.2d 831.

VII

The Conflicts Between The Oversight Regulations And ISRA
Finally, appellants urge that particular oversight regulations conflict with provisions of ISRA, supra. Specifically, they argue: *359 that there are conflicts between the definitions in key terms used in the two laws; that the oversight regulations allow DEP to extract promises and types of remediation from parties not permitted under ISRA; that the oversight regulations restrict a party's rights to challenge DEP determinations, while ISRA expands such rights; and that the oversight regulations permit DEP to impose restrictions not authorized by ISRA. They ask that we remand the oversight regulations to DEP in order that the rules be conformed to all ISRA requirements.

A. Remedial Actions
The first conflict appellants point to is the definition of "remedial actions," which under the oversight regulations, but not ISRA, includes "permanent relocation of residents and businesses and community facilities ... [and] the restoration of natural resources." N.J.A.C. 7:26C-1.3.
DEP asserts that the definition of "remedial actions" as used in the regulations is authorized by the Spill Act and Water Pollution Control Act. It contends that the oversight regulations are "consistent with" ISRA. Moreover, DEP argues that as long as the regulations are properly based on the provisions of the Spill Act and Water Pollution Control Act they need not also be based on ISRA.
"The nature of the subject matter, the contextual setting, and statutes in pari materia must all be viewed together in seeking legislative intent." State v. Wright, 107 N.J. 488, 502, 527 A.2d 379 (1987). An administrative regulation must be "consistent with the expressed policy of the enabling statute and related legislation." Texter v. Human Services Dep't, 88 N.J. 376, 387, 443 A.2d 178 (1982).
As appellants point out, the definition of "remedial actions" in the oversight regulations includes the "permanent relocation" of persons, businesses and facilities "where the Department determines that, alone or in combination with other measures, such relocation is more cost-effective than, and environmentally preferable *360 to, the transportation, storage, treatment, destruction, or secure disposition off-site of such contaminants, or may otherwise be necessary to protect human health." N.J.A.C. 7:26C-1.3. The ISRA definition, however, does not include any such definition. N.J.S.A. 13:1K-8.
Nevertheless, while the Spill Act and ISRA are both concerned with remediation of contaminated sites, the "triggering event" under ISRA is a "transfer" or "closing" of a site, N.J.S.A. 13:1K-9, and under the Spill Act it is the "discharge of ... hazardous substances." N.J.S.A. 58:10-23.11a. In other words, the Spill Act was intended to have a much broader application inasmuch as it may apply to effect a cleanup regardless of whether a party is transferring or closing an operation. We find this significant in this context. Here, DEP primarily based the oversight regulations on the Spill Act, with its broader reach. Thus, the Spill Act extends to measures to protect the "public health, safety, or welfare," which we are satisfied may include the relocation of people and/or businesses. N.J.S.A. 58:10-23.11b.d.
DEP further claims that the challenged language can be justified given the provisions of N.J.S.A. 58:10-23.11g.c(1), which makes a party responsible for "all costs of cleanup and removal." As DEP points out, "cleanup and removal" costs include all costs associated with the "taking of reasonable measures to prevent or mitigate damage to the public health, safety or welfare, including, but not limited to, public and private property ... including wildlife and other natural resources...." N.J.S.A. 58:10-23.11b.d. In a given case, the permanent relocation of persons or businesses could be necessary if the spill were severe enough. As a result, the inclusion of the relocation power within the oversight regulations is not plainly unreasonable. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984).

B. Definitions Of "Owner," "Operator," "Direct Owner Or Operator," And "Change In Ownership"
Appellants next point out that, unlike the oversight regulations, ISRA defines "owner," "operator," "direct owner or operator," *361 and "change in ownership" so as to provide exemptions from ISRA liability to those with mortgages or other security interests in contaminated property. See N.J.S.A. 13:1K-8. DEP responds that the oversight regulations are "not actually inconsistent with" these provisions of ISRA, so that the ISRA definitions may simply be read into the "underinclusive" oversight definitions.
We find nothing in the oversight regulations that would empower DEP to classify as responsible parties those persons with only a security interest in a contaminated site. Thus, we hold that the ISRA definitions of "owner," "operator," "direct owner or operator" and "change in ownership" must be read into the oversight regulations. See State v. Green, 62 N.J. 547, 554-55, 303 A.2d 312 (1973) ("Statutes in pari materia ... [should] be construed together when helpful in ... ascertain[ing] ... legislative intent[,]" and "it is basic in the construction of legislation that every effort should be made to harmonize the law relating to the same subject matter").

C. Definition Of "Remedial Alternative Analysis"
Appellants next point out that the oversight regulations define "remedial alternative analysis" in terms closely akin to a "feasibility study" as required under CERCLA.[2] They contend the expressed legislative intent of ISRA was, in part, to "[e]liminate feasibility studies" as defined under CERCLA. DEP acknowledges that the oversight regulations are inconsistent with ISRA in this respect, and asserts that it "is in the process of preparing to propose a modification of the regulation that will change this definition." With that concession, we order DEP to promptly modify its oversight regulations to conform to the definition in ISRA.

*362 D. Use Of "Financial Assurance Funds"
Appellants next assert that while ISRA provides that "financial assurance funds" may only be used for "remediation," the oversight regulations "appear to make them available for oversight [costs] as well." DEP says that the requirement of "financial assurances" under the oversight regulations has now been supplanted by ISRA's "remediation funding source," but that in any event it never intended to use sums posted as "financial assurance" for oversight costs. Accordingly, we hold that the oversight regulations are to be construed as allowing DEP to draw upon financial assurance funds only for remediation costs as defined in ISRA. N.J.S.A. 13:1K-8; N.J.S.A. 58:10B-1.

E. Internal Review Of DEP's Decisions
Appellants challenge the limited right of review of DEP decisions under the oversight regulations as compared to the "expansive right" to contest DEP determinations under ISRA. Specifically, they argue that while ISRA directs DEP to develop guidelines establishing a procedure through which a person conducting a remediation may receive an "expedited review" of any DEP decision, the oversight regulations require that the person wait until DEP attempts to enforce the terms of an administrative consent order before receiving a review of a DEP determination. DEP counters that the dispute resolution procedure outlined in ISRA is not at odds with the oversight regulations' requirement that the party will only contest the terms of an administrative consent order if DEP brings an enforcement action.
The "expedited review" provisions of ISRA apply only to decisions within DEP:
a. Any person conducting a remediation of a contaminated site may dispute a decision by the department concerning the remediation in accordance with the guidelines developed pursuant to subsection b. of this section. The disputed decision shall be reviewed, and a determination shall be made, by the next level of the department's management, and the review may continue, upon the request of the person seeking review, until the commissioner or his designee has issued a decision on the dispute. Each successive level of management review and the *363 resulting determination on the dispute shall occur within seven days of the department's receipt of the request for review.
b. Within 60 days of the effective date of [ISRA], the department shall develop guidelines that establish a procedure through which a person conducting a remediation of a contaminated site may dispute a decision concerning the remediation. Those guidelines shall include provisions for an expedited review procedure under which the commissioner, or his designee, shall issue a decision on the dispute within 21 calendar days of the date on which the request for that review was received.
[N.J.S.A. 58:10B-17.]
Thus, while ISRA establishes certain time frames and procedures whereby a party might obtain review of administrative decisions by higher levels within DEP, it does not entitle a party to an expedited review of any final or ultimate DEP decision.
We note that when DEP first set forth its proposed regulations, it appreciated that "a misunderstanding or disagreement on substantive technical issues [might develop between it and a party] at various key points throughout the cleanup process." 24 N.J.R. 1284 (April 6, 1992). In response, DEP proposed "full and open communication" between itself and the party. Ibid. Short of any refusal by the party to abide a provision in an administrative consent order and await DEP's enforcement action, DEP promised "[a] responsible party ... the express opportunity to meet with ... [it] prior to ... [its] making certain key decisions." Ibid. DEP "[t]hrough this mechanism, ... intends to consistently encourage the regular exchange of views and opinions with the party to avert the escalation of issues into adversarial disputes." Ibid.
The oversight regulations provide that "[i]n the event a conflict arises between [DEP and the party] ... the ... [party] may institute ... [DEP's] internal process for resolving disputes." N.J.A.C. 7:26C, Appendix C, § XV para. 1. If the party is not satisfied at the first level with the resolution, he or she may contact the case manager's supervisor and, if still not satisfied, "continue up the chain of command," ultimately to the commissioner or to his or her designee. Ibid.
This language falls short of the specific administrative review guaranteed by ISRA. Accordingly, we require that the specific timely administrative review set forth by ISRA be included in the *364 site remediation regulations. There is no legitimate reason for the administrative review of ISRA not to be included in the site remediation regulations. Once a party has exhausted the review rights under N.J.S.A. 58:10B-17, the oversight regulations' prohibition against the party's challenging the final DEP decision in court until DEP commences an enforcement action still applies. See State, Dep't of Envtl. Protection, supra, 246 N.J. Super. at 336, 587 A.2d 657 (where we noted that "intermediate procedural entanglements in judicial proceedings should be avoided and were inconsistent with the philosophy expressed by the Spill Act and Kimber, i.e., that remediation and clean-up come first and that litigation must abide those priorities").

F. Use And Access Restrictions On Site Owners
Appellants next contend that the RP-ACO vests DEP "with virtually unlimited power to impose use and access restrictions on site owners" wherever "necessary." ISRA, it argues, generally bars DEP from imposing such restrictions. DEP replies that ISRA only prohibits forcing deed restrictions on property owners when the property owner agrees to clean up the property to "residential standards." DEP maintains that the oversight regulations and ISRA do not conflict.
Under the oversight regulations, the owner of a site "shall impose such use and/or access restrictions as may be deemed necessary by ... [DEP]." N.J.A.C. 7:26C, Appendix C, § XVI, para. 26. The restrictions are to provide "actual and constructive notice ... of the locations and concentrations of all contaminants which remain at the site and of the use and access restrictions imposed." Ibid.
Under ISRA, DEP "may not, as a condition of allowing the use of a nonresidential use soil remediation standard, or the use of institutional or engineering controls, require the owner of that real property, except as provided in ... [N.J.S.A. 58:10B-13], to restrict the use of that property through the filing of a deed easement, covenant, or condition." N.J.S.A. 58:10B-12h(3). Pursuant *365 to N.J.S.A. 58:10B-13, whenever real property is remediated to "a nonresidential soil remediation standard or engineering or institutional controls are used in lieu of remediating a site to meet an established remediation standard," DEP shall, as a condition of the use of that standard or control measure,
(2) require, with the consent of the owner of the real property, the recording with the office of the county recording officer ... a notice to inform prospective holders of an interest in the property that contamination exists on the property at a level that may statutorily restrict certain uses of or access to all or part of that property, a delineation of those restrictions, a description of all specific engineering or institutional controls at the property that exist and that shall be maintained in order to prevent exposure to contaminants remaining on the property, and the written consent to the notice by the owner of the property.
[N.J.S.A. 58:10B-13a(2).]
In addition, under N.J.S.A. 58:10B-13, DEP shall require: engineering or institutional controls that it determines are "reasonably necessary," maintenance of those controls, and "the restriction of the use of the property in a manner that prevents exposure" to any contamination, ((a)(1)); notice to the local governing body as to the condition of the site, ((a)(3)); signs posted at access points as determined to be necessary by DEP, ((a)(4)); a list of restrictions to be kept on site for inspection, ((a)(5)); and notice to be given to the local governing body as to the planned remediation, ((a)(6)). Ibid. Where the owner does not consent to the recording of a notice as specified in N.J.S.A. 58:10B-13a(2), DEP "shall require the use of a residential soil remediation standard." N.J.S.A. 58:10B-13b. Appellants state that, "by negative implication," N.J.S.A. 58:10B-13 prohibits DEP from imposing deed restrictions where a party has remediated a site to residential standards without institutional and engineering controls, whereas under the oversight regulations DEP could impose such restrictions.
The effect of N.J.S.A. 58:10B-13 is to permit DEP to require deed restrictions as to the use of property where (1) property is remediated to a nonresidential soil remediation standard, or controls are used in lieu of remediating to an established remediation standard and (2) DEP obtains the owner's permission. N.J.S.A. *366 58:10B-13a(2). If the owner will not give his consent, DEP must require the use of nothing less than a residential soil remediation standard. N.J.S.A. 58:10B-13b. But other than as provided in N.J.S.A. 58:10B-13, DEP cannot require deed restrictions as a means of approving the use of a lesser remediation standard.
While it is true that the oversight regulations provide that a person shall impose such use and/or access restrictions "as may be deemed necessary" by DEP, the regulations apply only when the signatory of the RP-ACO is the owner of the property at issue. N.J.A.C. 7:26C, Appendix C, § XVI para. 26.
DEP attempts to explain the apparent inconsistency between the oversight regulations and ISRA by claiming that where the responsible party is not the "owner," that party "may be required to obtain a deed restriction, whether he places it on the property himself or obtains permission from the owner." We reject DEP's claim that ISRA "does not prohibit [all] deed restrictions as a condition of allowing remediation to be performed to non-residential standards but rather [only] prohibits forcing such restrictions on a property owner." First, a "responsible party," who is not an owner, would be unable to place deed restrictions on a property. Second, ISRA makes it clear that there is only one exception to the ban on DEP's requiring, as a condition of permitting a remediation to a nonresidential soil remediation standard, a deed restriction. The only exception is when the owner consents to the restriction. N.J.S.A. 58:10B-12h(3); N.J.S.A. 58:10B-13a(2) and b. The oversight regulations do not mention the owner's consent.
Nevertheless, given DEP's expressed intent of applying the oversight regulations in a manner consistent with ISRA, we do not invalidate that portion of N.J.A.C. 7:26C that provides "as may be deemed necessary by the Department." We interpret this language as being subject to the ISRA provisions governing deed restriction use. In other words, where a party seeks to remediate to a nonresidential soil remediation standard, or to use controls in lieu of remediating to an established remediation standard, ISRA *367 applies and DEP must follow ISRA's provisions as to use and access restrictions.

VIII

Conclusion
Accordingly, we (1) remand to DEP for an explanation of the manner in which it determined the salary additive factor; (2) reverse DEP's determination to multiply the indirect cost factor by the product of the sum of coded hours by the hourly rates, by the salary additive factor, by the fringe benefit factor, rather than adding the product of the sum of coded hour by the hourly rates, by the indirect cost factor to that product; (3) order DEP to modify promptly its regulation to change the definition of remedial alternative analysis; (4) hold that if DEP commences a civil action based on the RP-ACO, a responsible party may raise the defense that DEP's decision pursuant to the RP-ACO was arbitrary, capricious or unreasonable; (5) hold that the oversight regulations must be interpreted to allow a responsible party to assert later developed evidence, and to rely on such evidence in asserting a good cause defense in refusing to continue complying with a directive; (6) order that the ISRA definitions of "owner," "operator," "direct owner or operator," and "change in ownership" must be read into the oversight regulations; (7) order that the oversight regulations must be construed as allowing DEP to draw upon "financial assurance funds" only for remediation costs as defined in ISRA; (8) order DEP to include within the site remediation regulations the specific timely administrative review set forth in ISRA; (9) order that where a party seeks to remediate to a non residential soil remediation standard, or to use controls in lieu of remediating to an established remediation standard, ISRA applies and DEP must follow ISRA's provisions as to use and access restrictions; and (10) affirm in all other respects.
NOTES
[1] At the time of the adoption of these regulations the Department was know as the Department of Environmental Protection and Energy. Since that time, it has been renamed The Department of Environmental Protection.
[2] Comprehensive Environmental Response Compensation and Liability Act. 42 U.S.C.A. §§ 9601 to 9657.