773 A.2d 1215

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, PETITIONER–RESPONDENT, v. BAYSHORE REGIONAL SEWERAGE AUTHORITY, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 27, 2001—Decided June 8, 2001.

Before Judges A.A. RODRIGUEZ, COLLESTER and FALL.

*Granata, Wernik & Zaccardi,* attorneys for appellant (*Louis E. Granata,* on the brief).

*John J. Farmer, Jr.,* Attorney General, attorney for respondent (*Mary C. Jacobson,* Assistant Attorney General, of counsel; *Robert A. Marshall,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

RODRIGUEZ, A.A., J.A.D.

In this appeal we reject the contention by a local sewerage treatment authority that the Sewerage Authority Law (SAL), *N.J.S.A.* 40:14A–1 to –37, precludes regulation by the Department of Environmental Protection (DEP). Therefore, the DEP Commissioner did not err by failing to recognize the authority's immunity from the Water Pollution Control Act (WPCA), *N.J.S.A.* 58:10A–1 to –60, and DEP regulation.

Respondent, Bayshore Regional Sewerage Authority (Bayshore), appeals from the DEP Commissioner's final decision that affirmed the DEP's denial of Bayshore's request for a force majeure exemption [1] and the DEP's imposition of a $50,000 administrative penalty for Bayshore's effluent discharge violations of the WPCA, and an Administrative Consent Order. We affirm.

The salient facts can be summarized as follows. Bayshore operates a sewage treatment plant in Union Beach Borough. The DEP issued Bayshore a Pollutant Discharge Elimination System Discharge to Surface Water (NJDEPS) Permit. This permit allows Bayshore to discharge treated pollutants into the State's waters up to certain specified levels. Such permits are authorized by the WPCA and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (1999).

Pursuant to these permits, Bayshore acts as a delegated authority and, as such, is required to issue Industrial User permits to any indirect users of its facility and to regulate their use. There are three facilities in Bayshore's service area which operate industrial pretreatment plants. These plants discharge pretreated wastewater to Bayshore. Bayshore has the authority to reject wastes and to terminate its services altogether if these facilities do not pretreat their wastewater properly.

In 1991, based on outstanding violations, the DEP and Bayshore entered into an Administrative Consent Order which provided, among other things, that: (1) Bayshore had a responsibility for regulating its users; (2) Bayshore was subject to stipulated penalties of $5,000 per effluent violation; and (3) a force majeure clause. The force majeure clause required Bayshore to notify the DEP in writing, within seven calendar days, of any delay or anticipated delay in the achievement of any provision in the Administrative

---

[1] The term "force majeure" (a superior force) applies to an event or effect that can be neither anticipated nor controlled. It can include both acts of nature and humans.

Consent Order.  Such notification would provide Bayshore with a defense to any effluent violations.

In 1994, the discharge monitoring reports submitted by Bayshore, for the period of August 19, 1994 to September 1994, revealed that Bayshore had exceeded the effluent limitations on ten occasions.  As a result, the DEP issued a notice of violation to Bayshore.

In response, Bayshore submitted a force majeure request, conceding that it "had exceeded all parameters for total suspended solids due to a persistent foam which we feel is caused by an organic oil emulsion which has plagued our plant since the middle of July, and suddenly disappeared on the weekend of September 24 and 25." Bayshore detailed its efforts to eliminate the foam. The letter explained that one of its indirect users, a plant owned by International Flavors and Fragrances (IFF), had reported having "problems" with its pretreatment of wastewater, namely high levels of chemical oxygen demands.  When IFF turned off its carbon filters, Bayshore noticed that "the foam came back heavier than it had been."  In an earlier letter to the DEP, Bayshore also stated that its problems with foam "coincide[d] with problems at IFF Manufacturing and their use of their carbon filters.  When in use, foam subsided;  when not, foam increased."

The DEP requested further information to support Bayshore's force majeure request, asking for a "detailed description as to the processes that Bayshore undertook to try to determine possible outside sources of the upset."  Bayshore submitted additional information, including a chronological order of activities and plant upset.

The DEP denied Bayshore's request for force majeure relief for the period of August to September 1994 and issued a demand letter for stipulated penalties in the amount of $50,000.  The DEP explained that Bayshore's delay in initiating an outside or "upstream" investigation of the excessive foaming disqualified it from relief.  The DEP did, however, grant Bayshore force majeure relief for effluent violations dating from October 1994 through

February 1995 because Bayshore had initiated timely in-plant and out-of-plant investigations for those violations.

Bayshore requested reconsideration of the denial. The DEP declined reconsideration repeating its initial reasons. Bayshore responded by refusing to pay the penalties. The DEP issued a notice of civil administrative penalty assessment to Bayshore. Pursuant to *N.J.A.C.* 7:14–8.4(a), Bayshore requested an administrative hearing.

At a hearing before Administrative Law Judge Bruce R. Campbell, the DEP called two witnesses: Maureen Byrne, a Principal Environmental Specialist with the DEP; and Richard Paull, the DEP's Section Chief for Water Compliance and Enforcement. Bayshore called three witnesses: Gary Marshall, its Executive Director; Richard Jenkins, its Superintendent; and Christopher Livesey, its Assistant Superintendent of Operations.

Judge Campbell found that the DEP did not arbitrarily or capriciously deny Bayshore's request for force majeure relief for two reasons: (1) because Bayshore failed to timely apply for force majeure relief; and (2) because Bayshore did not adequately investigate the source of the foaming. In particular, Judge Campbell noted that testimony by Bayshore witnesses, namely Livesey and Jenkins, established that Bayshore "did not do all that it was reasonable to do," and that Bayshore had no explanation for its failure to order IFF to cease its discharges in July 1994. In addition, Judge Campbell found that Bayshore was not entitled to plead the affirmative defenses of upset (pursuant to *N.J.S.A.* 58:10A–10.2) or force majeure (pursuant to the Administrative Consent Order) because it had not complied with the time requirements of either defense. Lastly, Judge Campbell rejected Bayshore's claim that it was exempt from DEP regulation because the SAL provided Bayshore with plenary authority. As such, Judge Campbell upheld the DEP's denial of Bayshore's request for force majeure relief.

Bayshore filed exceptions to this decision arguing that Judge Campbell had erroneously rejected Bayshore's force majeure de-

fense. The Commissioner upheld Judge Campbell's initial decision. The Commissioner adopted the ALJ's findings and concluded that Bayshore's exceptions had failed to raise any issues that were not "sufficiently addressed by the ALJ" and that the decision was supported by substantial, credible evidence in the record.

Bayshore now appeals to us contending that: (1) the Commissioner erred by affirming the ALJ's decision without regard for the arbitrary and capricious manner in which the original decision was made; (2) the decision adopted by the Commissioner was issued without an application of the proper standard of review of the DEP's interpretation of its statutory mandate; and (3) the decision adopted by the Commissioner was erroneous since it relied upon the DEP's own interpretation of the law.

We disagree with these contentions. The decision by the Commissioner and the ALJ are supported by sufficient credible evidence on the record as a whole. *R.* 2:11–3(e)(1)(D). Moreover, we reject Bayshore's argument that the SAL precludes DEP regulation of sewerage authorities. Therefore, the Commissioner did not err by failing to recognize that Bayshore is immune from the WPCA and DEP regulation. This argument is without merit.

Bayshore clearly falls within the purview of the WPCA because it is both a "municipal treatment works" and a "local agency." *N.J.S.A.* 58:10A–3. Moreover, as a NJDEPS permit holder, Bayshore is subject to the WPCA. The WPCA was specifically enacted to enable New Jersey to "implement the permit system required by the Federal Act." *N.J.S.A.* 58:10A–2. Further, the WPCA delegates authority to the DEP to "[e]xercise general supervision of the administration and enforcement of this act and all rules, regulations and orders promulgated hereunder" and to "[a]ssess compliance of a discharger with applicable requirements of State and Federal law pertaining to the control of pollutant discharges...." *N.J.S.A.* 58:10A–5. Indeed, the legislative history to the statute explicitly explains that it seeks to:

strengthen the enforcement of the State's water pollution control and prevention program ... by increasing other enforcement responsibilities of DEP [and] by

requiring stricter accountability on the part of both public and private holders of water pollution control permits, by requiring publicly owned treatment works (POTWs) to improve their operations, particularly with respect to monitoring and treating hazardous pollutants discharged into POTWS by industries [.] . . .

[Senate Revenue, Finance and Appropriations Committee Statement to S. 2188, *reprinted in N.J.S.A.* 58:10A–3.]

Ignoring this plain statutory language, Bayshore focuses narrowly on a specific section of the SAL, *N.J.S.A.* 40:14A–35. That section reads:

This act shall be construed liberally to effectuate the legislative intent and as complete and independent authority for the performance of each and every act and thing herein authorized, and a *sewerage authority shall not be subject to regulation as to its service charges or as to any other matter* whatsoever by any officer, board, agency, commission or other office of the State.

[*N.J.S.A.* 40:14A–35 (emphasis added)].

This section, Bayshore argues, would provide it with "broad" authority and would preempt DEP oversight of any decisions made by Bayshore regarding the "manner of treatment and control of effluent." In short, Bayshore concludes that the statute provides it with plenary authority.

Bayshore's narrow focus on this lone provision in the SAL fails to recognize that both the WPCA and SAL seek to reduce pollution. In *Shupack v. Manasquan River Reg'l Sewerage Auth.*, 194 *N.J.Super.* 199, 204, 476 *A.*2d 816 (App.Div.1984), we recognized "that the purposes of the [SAL] and [WPCA] are similar." In the absence of any inconsistency between local and state laws, we rejected the argument that a sewerage authority, because it is governed by the SAL and WPCA, need not comply with local site plan and building permit requirements. *Id.* at 203, 476 *A.*2d 816. Given this common goal of both statutes, it would equally be erroneous to provide sewerage authorities with immunity from water pollution control requirements.

Here, Bayshore fails to provide any specific examples of inconsistencies between the WPCA and the SAL. It relies instead on the general language contained in *N.J.S.A.* 40:14A–35. As we have noted, this reliance is misplaced. Further, by signing the Administrative Consent Order, Bayshore specifically acknow-

ledged and agreed that it was subject to the conditions of the WPCA. The order states that Bayshore agreed that it "shall discharge wastewater only in accordance with the New Jersey Water Pollution Control Act, *N.J.S.A.* 58:10A–1 *et seq.* and the regulations promulgated pursuant thereto, *N.J.S.A.* 7:14A–1 *et seq.* and NJDEPS Permit No. NJ0024708." Thus, Bayshore is bound by its previous acknowledgment of DEP authority. It also bound itself contractually to the terms of the order. *See E.I. du Pont de Nemours & Co. v. Dep't of Envtl. Prot.,* 283 *N.J.Super.* 331, 661 *A.*2d 1314 (App.Div.1995) (affirming the DEP's authority to enter into enforceable administrative consent orders).

Accordingly, the final decision of the DEP Commissioner is affirmed.