292 N.J. Super. 501 (1996)
679 A.2d 179
ROBERT E. OHAUS; BLAIR C. OHAUS; JAMES G. OHAUS; JOHN C. OHAUS; THOMAS C. OHAUS; DEBORAH O. CASSELBERRY AND OHAUS CORPORATION, PLAINTIFFS-APPELLANTS,
v.
CONTINENTAL CASUALTY INSURANCE COMPANY; EMPLOYERS INSURANCE OF WAUSAU; FEDERAL INSURANCE COMPANY; FIRST STATE INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA; NEW JERSEY MANUFACTURERS INSURANCE COMPANY; NEW JERSEY PROPERTY LIABILITY INSURANCE GUARANTY ASSOCIATION; AND NORTH RIVER INSURANCE COMPANY, DEFENDANTS, AND THE TRAVELERS INDEMNITY COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*503 Before Judges SHEBELL, STERN and NEWMAN.
Thomas E. Mesevage argued the cause for appellants (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Robert D. Chesler, of counsel; Mr. Mesevage, on the brief.)
Jeffrey S. Lipkin argued the cause for respondent (Shanley & Fisher, attorneys; James M. Altieri, of counsel; Mr. Lipkin, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause amicus curiae for State of New Jersey, Department of Environmental Protection and Energy (Deborah T. Poritz, Attorney General of New Jersey, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Jordan, on the brief amicus curiae).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
On May 8, 1992, plaintiffs filed their complaint, naming various insurance companies as defendants seeking a declaratory judgment compelling their insurers to provide them, pursuant to the terms of comprehensive general liability (CGL) policies, with coverage for environmental remediation liability imposed under the Environmental Cleanup Responsibility Act ("ECRA"), L. 1983, c. 330, (now known as the Industrial Site Recovery Act ("ISRA"), L. 1993, c. 139). Plaintiffs have settled with all defendants except The Travelers Indemnity Company ("Travelers").
Travelers moved for summary judgment. The Law Division judge heard argument on the motion, and reserved decision. On February 22, 1994, the judge entered an order granting summary judgment, and attached a statement of reasons supporting his decisions to the order. Plaintiffs appeal.
*504 Ohaus Corporation (Ohaus), owned by the individual plaintiffs who are members of the Ohaus family, manufactured scales at its Florham Park facility beginning in 1969. In September 1986, Ohaus retained First Environment to conduct an environmental survey of its facility in connection with a planned inter-family redistribution of assets. The site is adjacent to the Pinch Brook County Golf Course and property owned by Metropolitan Life Insurance.
As a result of the survey, five areas of potential environmental concern were identified: an underground oil tank; an underground gasoline tank; a "drywell"; a "denuded" area; and a lowlands area. First Environment tested soil samples from the five areas and bored four groundwater monitoring wells. Soil beneath the oil tank revealed the presence of petroleum hydrocarbons, and soil in the dry well area indicated the presence of volatile organic compounds including methylene chloride, 1, 1-dichloroethylene, 1,1, 1-trichloroethane and trichloroethene. Floor drains in the flammables storage area were connected to the dry well. Soil in the other areas did not show the presence of volatile organic compounds above regulatory guidelines. In two of the four wells, the presence of volatile organic compounds was detected. Following excavation, the underground gasoline tank, dry well and denuded areas were backfilled with clean soil, and the floor drains leading to the dry well were sealed.
On December 2, 1988, Ohaus executed an agreement to transfer its assets to Mettler Instrument Corporation (Mettler). The agreement obligated plaintiffs to comply with environmental requirements and indemnify Mettler for any losses suffered as a result of their failure to comply. Pursuant to ECRA, Ohaus submitted to DEP its General Information Submission (GIS) and Site Evaluation Submission (SES). On May 1, 1989, Ohaus entered into an administrative consent order (ACO) with DEP.
In its August 1990 report on the results of its sampling and soil remediation and its plan for the proposed cleanup of soils, First Environment stated that it had taken soil samples and drilled an *505 additional four monitoring wells at the site. It identified three areas as needing further investigation or remediation: the "groundwater beneath the site"; the denuded area; and the "former drywell excavation." The report noted that surface drainage at the site was to the north "into a low lying naturalized area near the golf course." Pinch Brook flowed through the golf course into Black Brook, which in turn flowed into the Whippany River. The groundwater, however, flowed in a westerly direction across the site.
With respect to groundwater contamination, it appears that four of the wells were found to contain volatile organic compounds above ECRA guidelines. First Environment considered the former dry well "a suspected ... source of groundwater contamination." A well located 150 feet downgrade of the dry well area contained 92 ppb of trichloroethene and other contaminants, and a well adjacent to the dry well area revealed 35 ppb of trichloroethene. Trichloroethene was also found in two wells located at the northwestern property boundary. First Environment found no contaminants in an upgradient well or in the well south of the dry well area. Based on these test results and groundwater flow direction, it concluded that there was a "high probability that volatile organic compounds are migrating from the site in a westerly direction." It proposed a soil boring and groundwater monitoring program to determine the horizontal and vertical extents of the groundwater contaminants. New wells were to be drilled off-site, and additional wells were to be placed along the northwest and southwest boundaries.
On April 12, 1991, Ohaus first notified Travelers that it had "become aware of elevated levels of volatile organic compounds" at its facility, had notified DEP of the matter and was in the process of pursuing a sampling plan. Ohaus requested assurance that its policies covered its remediation, sampling, and other contamination-related costs.
Also in April 1991, First Environment conducted a groundwater boring program on the Metropolitan Life property, a contiguous *506 tract south/southwest of the Ohaus site. In two of the four wells, "trace" amounts of contaminants including trichloroethene were found. It concluded that the Ohaus facility had not impacted the Metropolitan property at that time.
Around the same time, a groundwater boring sample from the Pinch Brook Golf Course to the northwest of the Ohaus site indicated the presence of trichloroethene at less than 10 ppb at a depth of twenty-two to twenty-four feet, and at 10 ppb at a depth of forty-four to forty-six feet. First Environment opined that these boring results showed "that the plume of contaminated groundwater centering to the rear of the ... facility adjacent to the loading docks and hazardous waste trailer has migrated beneath the grounds of the ... [golf course]."
In January 1992, First Environment issued its remediation results and proposed groundwater delineation activities. On March 3, 1993, DEP conditionally approved Ohaus's sampling plan. Among the conditions, it required Ohaus to install a monitoring well in the area of boring B-12 "to monitor for contamination moving off site." In May 1993, First Environment issued additional soil and groundwater sampling results, noting that with one exception considered anomalous, the presence of volatile organic compounds in the monitoring wells had decreased substantially. It attributed this decline to "natural alteration of volatile organic compounds through biological degradation," as well as to the earlier removal in May 1991 of the old dry well soil. It recommended quarterly monitoring of selected wells for a two-year period at a cost of $40,000.
On November 10, 1994, DEP, responding to plaintiffs' August groundwater monitoring report, indicated that increased contamination levels in particular wells would require drilling additional test wells, one on the golf course and two on the Metropolitan property. One of the wells showing an increase was on the property line between the Ohaus and the Metropolitan properties. After negotiations, DEP agreed that no additional testing of the golf course would be necessary, and rather than install monitoring *507 wells at Metropolitan, plaintiffs could present a proposal to further investigate groundwater below that property.
On January 26, 1995, plaintiffs submitted to DEP their remedial action workplan and fourth quarter monitoring results. Included was a groundwater site map from August 1994 delineating small portions of both the golf course and Metropolitan properties as within the contaminated groundwater area. Noting that in times of high precipitation the monitoring wells closest to the old dry well show heightened contaminant readings, the report hypothesized that a soil column of residual pollution below the former dry well continues to discharge contaminants into the monitoring wells. The report proposed a delineation soil boring program and a soil vapor extraction/air sparging treatment system.
Plaintiffs allege that they expect to spend in excess of $620,000 in remediation and investigation costs by the end of the two-year monitoring period. Neither the golf course nor Metropolitan have made claims against Ohaus for contamination. We have denied plaintiffs' motions to supplement the record with additional reports of groundwater sampling.
Between April 1974 and April 1982, Ohaus was covered by a series of annual CGL policies issued by defendant. Defendant agreed to pay "all sums which the Insured shall become legally obligated to pay as damages because of [bodily injury or property damage to which the insurance applied] ... caused by an occurrence." An "occurrence" was "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." "Property" was not defined.
"Property damage" included "physical injury to or destruction of tangible property which occurs during the policy period." Expressly excluded was property damage to
(1) property owned or occupied by or rented to the Insured;

(2) property used by the Insured; or
(3) property in the care, custody, or control of the Insured or as to which the Insured is for any purpose exercising physical control; but parts (2) and (3) of *508 this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the Named Insured.

With respect to the insured's duties to notify defendant of possible claims under the policies, the policies provided as follows:
(a) The Insured or someone on his behalf shall give written notice to The Travelers or its authorized representative as soon as practicable, including in the notice particulars sufficient to identify the Insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.
* * * * * * * *
(c) The Insured shall cooperate with The Travelers and, upon The Travelers' request, assist in making settlements in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under these sections; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.
The judge, in his written reasons for his grant of summary judgment, cited our Supreme Court's decision in State, Dep't of Envtl. Protec. v. Signo Trading Int'l, Inc., 130 N.J. 51, 612 A.2d 932 (1992), as the basis for his ruling that the "owned property" exclusions barred recovery. He concluded that insurance coverage for cleanup costs related to pollution of groundwater under the insured's land was excluded from coverage.
We reverse based on our holding in Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 419-20, 662 A.2d 562 (App.Div. 1995), that groundwater contamination is not excluded by the "owned property" exclusion in CGL policies. See also Reliance v. Armstrong, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996) and Kentopp v. Franklin Mut. Ins. Co., 293 N.J. Super. 66, 679 A.2d 701 (App.Div. 1996). We find no merit to defendant's argument that because neither the golf course nor DEP has made a damage claim against plaintiffs, plaintiffs do not face a "claim" for third-party property damage. Pursuant to ECRA, it was *509 plaintiffs' legal obligation to monitor and remediate the contaminated groundwater, as we will further discuss.
It is defendant's position that the investigatory and remedial expenses plaintiffs have undertaken pursuant to the ACO entered into with DEP are not "property damage" under the policies. Defendant claims further that plaintiffs' "voluntary" assumption of investigation, monitoring and cleanup prevents them, under the policies' voluntary payments provision, from receiving any coverage whatsoever.
"Damages" as applicable here were not defined under the policies, but the policies promised to pay "all sums which the Insured shall become legally obligated to pay as damages because of ... (b) property damage ... caused by an occurrence." We hold that plaintiffs' monitoring and investigation expenses may constitute "damages" under the policies.
It is well established that the State has the right to obtain damages for an injury to public resources or the environment. Lansco, Inc. v. Department of Envt'l Protec., 138 N.J. Super. 275, 283, 350 A.2d 520 (Ch.Div. 1975), aff'd, 145 N.J. Super. 433, 368 A.2d 363 (App.Div. 1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977). In addition, we have held that regulatory directives threatening punitive fines if the insured does not discharge its obligations constitute sufficient coercion to demonstrate that expenses undertaken to discharge those duties are "damages" and may be covered by CGL insurance. See Broadwell Realty Srvs., Inc. v. Fidelity & Cas. Co, of N.Y., 218 N.J. Super. 516, 527, 528 A.2d 76 (App.Div. 1987) (pollution remediation expenses covered), overruled on other grounds, Morton Int'l v. General Acc. Ins., 134 N.J. 1, 28, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994).
In Morton, supra, our Supreme Court broadened potential coverage by concluding that "environmental-response costs and remediation expenses" may be deemed damages within the meaning of a CGL policy. Morton, supra, 134 N.J. at 27, 629 A.2d 831. *510 The Court's statement as to what "damages" included was very broad, and its reference to "environmental-response costs" fairly allows the inclusion of monitoring, investigating and testing expenses which are necessary in determining the existence of contamination, the extent of any contamination, and the success of any necessary cleanup. Ibid. The Court's use of the phrase "remediation expenses" would encompass the actual costs of cleanup, so that its additional reference to "environmental-response costs" must be understood to mean more than just cleanup expenses. Ibid.
In addition, the Morton Court referred approvingly to Justice O'Hern's dissent in State v. Signo, supra, 130 N.J. at 74-76, 612 A.2d 932, where he broadly defined "damages," noting that to most people the term meant "money." 134 N.J. at 27, 629 A.2d 831. Money is what plaintiffs seek in their demand for reimbursement for the expenses of testing and monitoring. The monitoring and testing was imposed under environmental laws, and it does not appear that plaintiffs had grounds for refusing to enter into an ACO with DEP. Here, off-site contamination or the immediate threat of it, required the efforts necessarily undertaken by the insured to monitor pollution and investigate the extent of contamination. These actions constitute the exercise of the insured's duty to mitigate, which expenses are usually covered by insurance. McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 551 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir.1987); see General Acc. Ins. Co. v. State Dep't Envt'l Protec., 278 N.J. Super. 412, 417-18, 651 A.2d 472 (App.Div. 1995), rev'd, 143 N.J. 462, 672 A.2d 1154 (1996). It is the absence of a definition of "damages" that creates at least a reasonable question as to coverage, and therefore, the ambiguity will be construed against the insurer. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 177-78, 607 A.2d 1255 (1992).
Defendant urges that plaintiffs' agreement with DEP to investigate the contamination of and to cleanup the site was a voluntary assumption of liability for which coverage is excluded *511 under the policies. Defendant cites several out-of-state decisions holding that where such a policy exclusion exists, prejudice to the insurer is presumed. However, in New Jersey, where the insured has acted in good faith, an exclusion barring coverage for the insured's voluntary assumption of an obligation only applies where the insurer can establish "appreciable prejudice." Solvents Recovery Srv. of New England v. Midland Ins. Co., 218 N.J. Super. 49, 55, 526 A.2d 1112 (App.Div. 1987). We find no claim of bad faith. Therefore, on remand, defendant will be required to demonstrate how, if at all, it was prejudiced by plaintiffs' agreement with DEP.
The judge further held that plaintiffs' failure to timely notify defendant of the contamination at their site barred them from recovering all costs incurred prior to the date of notification. He stated it was "inexcusable" for plaintiffs to wait until April 1991 to notify defendant of the environmental problems at the site, and that even if he were to find coverage under the policies he would limit it to "costs" incurred after plaintiffs gave defendant notice.
The judge referred to SL Industries, Inc. v. American Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266 (1992), to support his determination. There, an insured brought an action for coverage against a former employee's suit alleging discrimination and wrongful conduct. 128 N.J. at 193-96, 607 A.2d 1266. The trial judge granted the insurers' motion for summary judgment. On appeal, we reversed. Ibid. The Supreme Court, in considering the issue of whether coverage should be barred on the basis that the insured withheld information from the insurer relevant to the defense, noted that an "insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage." Id. at 199-200, 607 A.2d 1266. The Court stated that where it does so, "it will be reimbursed for previously-expended defense costs," but where it does not act promptly, "the insured cannot demand reimbursement from the insurer for defense costs the insurer had no opportunity to control." Id. at 200, 607 A.2d 1266. In determining that the *512 insured could only recover defense costs expended after notifying the insurer of the relevant facts up to the time of settlement, the Court held: "[W]hen the insured's delay in providing relevant information prevents the insurer from assuming control of the defense, the insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend." Ibid.
The Court in SL Industries made it clear that it was affirming that portion of our opinion which directed a remand to, among other things, determine the extent to which the settlement reflected damages covered under the policy, and to make the appropriate allocation "of coverage and defense costs for such liability." 128 N.J. at 216, 607 A.2d 1266 (quoting 248 N.J. Super. 458, 467, 591 A.2d 677). Thus, the Court barred coverage for the costs of defense prior to the insured's disclosing the relevant information, but did not automatically extend that bar to the liability coverage itself. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co., 817 F. Supp. 1136, 1162-63 (D.N.J. 1993).
Our courts have consistently required that in order for coverage exclusionary provisions to apply, the insurer must show how it was prejudiced by the insured's actions. See Cooper v. Government Employees Ins. Co., 51 N.J. 86, 94, 237 A.2d 870 (1968); Solvents Recovery v. Midland Ins., supra, 218 N.J. Super. at 54-55, 526 A.2d 1112. Although defendant argues that plaintiffs' agreement with DEP resulted in expenses which plaintiffs "voluntarily assumed," there has been no showing that those expenses were unnecessary or excessive, or that plaintiffs could have successfully challenged responsibility for the contamination or cleanup. The question of whether the insured's derelictions caused the insurer "appreciable prejudice" requires findings of "whether substantial rights have been irretrievably lost by virtue of the failure of the insured to notify the carrier in a timely fashion," and "`the likelihood of success of the insurer in defending against the' underlying claim." Chemical Leaman Tank Lines v. Aetna Cas. and Sur., supra, 817 F. Supp. at 1158 (quoting Morales v. National *513 Grange Mut. Ins. Co., 176 N.J. Super. 347, 355-56, 423 A.2d 325 (Law Div. 1980)). This question may be addressed on remand.
We reverse and remand for further proceedings consistent with this opinion.
Judge STERN concurs for the reasons expressed in his concurring opinion in Reliance v. Armstrong, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996).