923 A.2d 345 (2007)
393 N.J. Super. 388
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and Administrator, New Jersey Spill Compensation Fund, Plaintiffs-Appellants,
v.
EXXON MOBIL CORPORATION, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 2007.
Decided June 6, 2007.
*346 Allan Kanner, New Orleans, LA, argued the cause for appellants (Stuart Rabner, Attorney General of New Jersey, Mr. Kanner and Elizabeth B. Petersen (Kanner & Whiteley), Special Counsel to the Attorney General, of the Louisiana bar, admitted pro hac vice, and Nagel Rice, Special Counsel to the Attorney General, attorneys; Richard F. Engel, Deputy Attorney General; Wayne Greenstone, Mr. Kanner and Ms. Petersen, and Bruce H. Nagel, of counsel and on the brief).
Theodore V. Wells, Jr., New York City, argued the cause for respondent (Archer & Greiner, and John F. Daum, Sharon Tomkins, and Matthew Kline (O'Melveny & Myers) of the California bar, admitted pro hac vice, Mr. Wells and Gaines Gwathmey (Paul, Weiss, Rifkind, Wharton & Garrison) of the New York bar, admitted pro hac vice, and Alice A. Brown of the Texas bar, admitted pro hac vice, attorneys; Ms. Brown, of counsel; Steven J. Fram, Marc A. Rollo, Mr. Daum, Ms. Tomkins, Mr. Kline, Mr. Wells and Mr. Gwathmey, on the brief).
*347 McCarter & English, Newark, attorneys for amicus curiae New Jersey Chamber of Commerce (Keith E. Lynott, Ira M. Gottlieb, Lanny S. Kurzweil, and Cynthia M. Stencel, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
PARRILLO, J.A.D.
At issue is whether an entity may be strictly liable under the New Jersey Spill Compensation and Control Act (Spill Act), N.J.S.A. 58:10-23.11 to -23.24, for damages for the loss of use of natural resources adversely affected by its discharge of hazardous substances, a question of first impression in this State. On leave granted, the New Jersey Department of Environmental Protection (DEP) and the Administrator of the New Jersey Spill Compensation Fund appeal from the May 26, 2006 order of the Law Division dismissing on summary judgment the State's statutory claim against defendant Exxon Mobil Corporation (Exxon Mobil or defendant) to recover such natural resource damages. For reasons that follow, we reverse and remand.
By way of background, at all relevant times Exxon Mobil operated petroleum refineries and petrochemical plants in both Linden and Bayonne. The Linden facility commenced operation as early as 1909 on 1300 acres (the Bayway site) and consisted of a refinery, two chemical plants, tank fields, and a distribution station. A waterfront area borders on the Arthur Kill. Two streams on the site join to form Morses Creek. Two tank fields on the site drain to the Rahway River. Land use in the vicinity of the site is residential, commercial, and industrial.
The Bayonne site originally consisted of 640 acres, but as of the late 1960s, was reduced to 288 acres including 250 acres of land and 38 riparian waterfront acres. The site is surrounded by heavy and light industry, interconnected by a transportation network of roadways, railroads, and the navigable waters of the Kill Van Kull and Upper New York Bay. Platty Kill Creek is located to the west of the site, the Upper New York Bay to the north, and the Kill Van Kull to the south.
During much of the period between 1909 and 1972, the Bayonne and Bayway refineries were interconnected by pipeline and operated as a single, integrated refinery and petrochemical facility, generally known as the "New Jersey Works" up until 1954, and thereafter the "Jersey Works". According to Exxon Mobil, the United States government controlled production activities at the New Jersey Works during World War II, resulting in increased production and greater quantities of wastes that needed disposal.
It is undisputed that during the course of its ownership and operation of these two sites, Exxon Mobil discharged hazardous substances, including petroleum products, into the natural resources of the State, and as a result extensive contamination exists beneath these properties, for which defendant acknowledges it is jointly and severally liable under the Spill Act. Consequently, in November 1991, Exxon Mobil entered into two administrative consent orders (ACOs) with DEP, in which it agreed to remediate the Bayway and Bayonne sites. The ACOs included provisions that contaminants had been detected in some portions of the soils and groundwater on and under each of the sites, and that Exxon Mobil had undertaken investigation, cleanup, and remediation operations on those sites under the direction and control of DEP. Significant for present *348 purposes, each of the ACOs recognized that the DEP's site remediation program did not preclude the State from seeking further relief for damages to natural resources:
This Administrative Consent Order shall not be construed to affect or waive the claims of federal or State natural resource trustees against any party for damages for injury to, destruction of, or loss of natural resources.
Correspondingly, Exxon Mobil acknowledged further that:
the police power of the State extends to the protection and conservation of natural resources which are not the private property of any person or entity; admits that by a longstanding legal fiction this proposition is sometimes inexactly expressed by saying that the State is the owner of natural resources for the benefit of its people; admits that DEP has certain regulatory authority with respect to natural resources within the State provided by law.
Apparently, cleanup processes underway at the two sites pursuant to the ACOs for the past fifteen years continue to date.
As part of its oversight of remediation of contaminated sites, DEP promulgated Technical Rules, (N.J.A.C. 7:26E-1.1 to -8.7) and Oversight Regulations that together provide the means, methods and requirements for parties to investigate and remediate contaminated sites in order to qualify for and obtain a "no further action" determination from DEP for such remediation. It has been DEP's longstanding position that "remediation" is just one of the processes involved in the cleanup of refinery sites and removal of contaminants thereon. According to DEP, remediation involves the cleanup of contaminants to "risk-based" levels, whereas "restoration" and "replacement" requires return of the natural resource to its pre-discharge condition (primary restoration) and replacement of the natural resource "services and values" lost in the interim between contamination and cleanup completion (compensatory restoration). The latter include both "human use" and "ecological" services, which encompass water uses such as for drinking and irrigation, and recreation such as swimming, fishing, boating, bird watching, or nature viewing. Thus, as one component of "natural resource damages" (NRD), DEP includes recovery for the residual injury that remains once the remedial cleanup process is completed, that is for the "loss of use" of the affected natural resource caused by the polluter's wrong. In other words, "loss of use" is a means of measuring the reduction of services provided by a polluted natural resource and establishing a value for its replacement.
As DEP noted in its responses to comments on the initial promulgation of the Technical Rules back in 1993, "restoration of natural resources is an important component in any remediation effort and the Department has the authority [under the Spill Act] to require it as appropriate." 25 N.J.R. 2281, 2289 (June 7, 1993) (response to comment 56). Upon readoption of the Technical Rules in May 1997, changes included: (i) addition of "natural resource damages" to the list of components contained in the definition of "remedial action costs" at N.J.A.C. 7:26E-1.8; (ii) definition of "injury", at N.J.A.C. 7:26E-1.8, as "any adverse change or impact of a discharge on a natural resource or impairment of a natural resource service, whether direct or indirect, long term or short term, and includes the partial or complete destruction or loss of the natural resource"; (iii) definition of "damages", at N.J.A.C. 7:26E-1.8, as "the amount of money the natural resource trustees, identified pursuant to 42 U.S.C. §§ 9601 et seq., have determined is necessary to restore, *349 rehabilitate, replace or otherwise compensate for the injury to natural resources as a result of a discharge." DEP published the following comment with the readoption of the Technical Rules:
In New Jersey, the Commissioner of the Department of Environmental Protection is the designated trustee charged with the duty of administering and protecting the State's natural resources. The Department's Office of Natural Resource Damages represents the Commissioner in this capacity and coordinates with the other trustees.
In keeping with its status as trustee for the public of the State's natural resources, the Department is concerned about those sites where discharges of hazardous substances impact or may potentially impact natural resources. Also of concern is remedial actions which, through their implementation, injure natural resources (such as dewatering a wetland through ground water extraction for treatment, or loss of functional habitat for roadway construction). The Department is authorized to seek compensation for such natural resource damages through legal means or cooperative settlement, with the objective of restoring the injured or lost resources. The Department's Office of Natural Resource Damages works closely with the various remediation programs to evaluate contaminated sites for natural resource damage claims. The Department encourages the person responsible for conducting the remediation to consult with and coordinate with the Office of Natural Resource Damages in assessing and estimating natural resource injuries and damages. Much of the information collected in the baseline ecological evaluation and follow-up ecological risk assessment efforts can be used in determining the injury to natural resources and consequently, the damage. Integrating natural resource damage issues into the site remediation program ensures collection of data that is useful for both the cleanup programs and trustees, promotes a remedy selection process that is cognizant of minimizing further potential injuries while creating opportunities for building restoration into the final remedy.
[29 N.J.R. 2278(b), 2392-93 (May 19, 1997) (response to comment 900).]
Consistent therewith, DEP instituted a natural resource damage (NRD) initiative in 2002, memorialized in the agency's Policy Directive 2003-07 of September 2003. See Bradley M. Campbell, Commissioner, New Jersey Department of Environmental Protection, Policy Directive 2003-07 (Sept. 24, 2003) http://www.state. nj.us/dep/commissioner/policy/pdir2003-07. htm (last visited May 17, 2007). This directive stated that responsible parties might alleviate the effects on the public of the loss of use of natural resources by providing "substitute resources or resource services," which could be "both in-kind and out-of-kind." As to groundwater resources, the Policy Directive's suggestions included "acquisition of aquifer recharge areas, water re-use or recycling projects, infrastructure improvements to control stormwater or improve recharge, reforestation efforts to improve infiltration and water retention, or any other measure that enhances the water resource base . . . ." For lost recreational uses, the Policy Directive recommended "enhancements to public access, creation of or improvements to state or local parks, or the provision of other alternate recreational opportunities."[1]
*350 With particular reference to Exxon Mobil, DEP's review and investigation identified "some preliminary restoration work on natural resources" that was recommended for the Bayway and Bayonne sites. On the former, one natural resource involved was the Morses Creek, which traverses the site and ultimately discharges into the Arthur Kill waterway. Morses Creek was historically used as a discharge trench for the refinery's waste water, and also received contamination from other facility operations and discharges. The creek's sediments were highly contaminated and the vegetation on its banks were severely diminished, if not destroyed. A dam at the creek's mouth, and "[b]ulkheading and rip-rap of the creek's banks" had precluded daily tidal influences to the creek's flood plain and associated marshes. According to John Sacco, Director of DEP's Office of Natural Resource Restoration, removing the dam and hardened creek banks would restore tidal flow to many of the former floodplain areas, which would be "essential to reestablishing former salt marshes". Creek dredging, with appropriate air emission controls, "would remove free product and contaminated sediments, thereby restoring suitable substrate for recolonization of benthic organisms". Similar dredging and replanting would be needed for the headwaters of Piles Creek, which was another ecosystem that also was compromised by hazardous constituents introduced over an extensive period.
Also on the Bayway site, marshland adjacent to the creek was "now mostly covered with a tar of petroleum products or filled with other hazardous constituents and debris," creating a "highly degraded ecosystem". According to Sacco, the contaminated sediments, fill, and tar would need to be removed, and clean substrate brought in, "to reestablish intertidal elevations" and restore marsh vegetation. Another forty-five acres of the Bayway site were comprised of "sludge lagoons," formerly tidal marshes which were used as hazardous waste disposal facilities. In the site remediation process, the lagoons were capped and walled to contain the contamination, but restoration would require excavation and reestablishment of marsh vegetation.
On the Bayonne site, "former tidally influenced wetlands" had been filled with chromium contaminated material, which Sacco recommended should be excavated and the wetlands environments rehabilitated. A portion of this site had been purchased from Exxon Mobil by International Matex Tank Terminals (IMTT), an entity that entered into an NRD settlement with the DEP. Under its settlement agreement, IMTT agreed to provide $3 million in funding over a four-and-a-half year period, for three projects: (a) $500,000 for completion of the North Forty Park in Bayonne; (b) construction of a public access walkway and viewing area in the vicinity of the Atlas Yacht Club; and (c) projects to eliminate or control combined sewer overflows in Bayonne. Sacco posited that, as compensation for the destruction of natural resources on its portions of the Bayonne site, Exxon Mobil could implement restoration projects similar to those being undertaken by IMTT.
No agreement was struck. Consequently, in August 2004, DEP filed two complaints *351 against Exxon Mobil, asserting Spill Act and common law claims of public nuisance and trespass, for natural resource damages for the discharge of hazardous substances at the Bayway site in Linden, and the Bayonne site. The complaints alleged that Exxon Mobil and its predecessors in interest discharged hazardous substances on the sites during decades of oil refining, petrochemical manufacturing and distribution operations. These operations allegedly affected natural resources that included: groundwater, surface water, and ecological resources such as wetlands, the plants and animals of the food chain that wetlands sustain, and the important wetlands functions such as improving water quality, trapping sediment, recharging groundwater, and protecting shorelines and lands from flooding or erosion. Among the cleanup and removal costs sought, plaintiffs asserted claims for "damages, including lost use . . . incurred for any natural resource of this State injured by the discharges of hazardous substances" at the sites.
On January 11, 2006, DEP moved for partial summary judgment, seeking a determination that Exxon Mobil was strictly liable as a matter of law for all cleanup and removal costs under the Spill Act, including the restoration of natural resources. Exxon Mobil cross-moved for summary judgment on the ground, inter alia, that the Spill Act does not provide liability for loss of use of natural resources. The Law Division granted both motions in part, holding that Exxon Mobil was strictly liable under the Spill Act for natural resource damages including restoration, but dismissing DEP's statutory claims for loss of use damages, concluding as to the latter:
Without any legislative or appellate directive, the court will not expand the definition of cleanup and removal costs under the Spill Act to include damages for the loss of use of natural resources. Moreover, the court finds no other language in the Spill Act that would hold a discharger strictly liable for the loss of use of natural resources. Therefore, Exxon Mobil's cross-motion for summary judgment, on this issue, is granted.
We first briefly reiterate what is not in issue here. Exxon Mobil does not dispute that it is strictly liable under the Spill Act for the costs of physical restoration of natural resources damaged or destroyed by its discharge of hazardous substances  what DEP refers to as "primary restoration" costs  as part of the "cleanup and removal costs" expressly stated in the Act. Indeed, the motion judge, on summary judgment, held defendant strictly liable as a matter of law for "cleanup and removal" costs including physical restoration of damaged or destroyed natural resources, and that determination is not before us on leave to appeal. Exxon Mobil also acknowledges that "loss of use" damages are available to the State under the common law[2] and other state statutes.[3] The only issue therefore is whether the Spill Act affords the State the same relief.
We turn then to a review of the Spill Act and its pertinent provisions. The Spill Act was enacted in 1976 as "a pioneering effort by government to provide monies for a swift and sure response to environmental *352 contamination." Marsh v. N.J. Dep't of Envtl. Prot., 152 N.J. 137, 144, 703 A.2d 927 (1997). In its preamble, the Legislature made detailed findings and a declaration of public policy to guide the interpretation of the Act. Specifically, the Legislature declared that New Jersey's lands and waters are "a unique and delicately balanced resource," deserving of "protection and preservation" by the State as "trustee, for the benefit of its citizens," and that the "discharge of petroleum products and other hazardous substances . . . constitutes a threat to the economy and environment of this State." N.J.S.A. 58:10-23.11a. Accordingly, "[t]he Legislature intends by the passage of this act to exercise the powers of this State to . . . provide liability for damage sustained within this State as a result of any discharge of said substances." Ibid.
To provide for swift and adequate compensation, and to implement these legislative goals, the Spill Act levied an excise tax on major chemical and petroleum facilities with the proceeds deposited into a permanent fund, known as the Spill Fund. N.J.S.A. 58:10-23.11h; Exxon Corp. v. Hunt, 109 N.J. 110, 114, 534 A.2d 1 (1987). Later amendments widened the Spill Fund's tax base, N.J.S.A. 58:10-23.11h (as amended by L. 1979, c. 346, § 6), and shifted control of the Fund from the Department of the Treasury to the DEP. N.J.S.A. 58:10-23.11i (as amended by L. 1985, c. 115, § 3).
The breadth of the Spill Act's findings and declaration is matched by its equally expansive strict joint and several liability scheme:
Except as provided in [N.J.S.A. 58:10-23.11g12], any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to [N.J.S.A. 58:10-23.11f].
[N.J.S.A. 58:10-23.11g(c)(1) (emphasis added).]
The Spill Act explicitly gives DEP two options regarding a hazardous discharge: (1) cleanup the discharge and bring an action to recover the costs, or (2) direct the discharger to cleanup or arrange for the cleanup of the discharge. N.J.S.A. 58:10-23.11f(a)(1) and -23.11q. A third option, implicit in DEP's broad implied powers, is that DEP can require responsible polluters to pay for cleanup and removal costs prior to remedial action. In re Kimber Petroleum Corp., 110 N.J. 69, 74, 539 A.2d 1181, appeal dismissed sub nom. Kimber Petroleum Corp. v. Daggett, 488 U.S. 935, 109 S.Ct. 358, 102 L.Ed.2d 349 (1988). Therefore, under the Spill Act, DEP has two roles, including the managerial role of deploying public funds to restore the environment and abate damages, and as "keeper of the public purse." Marsh, supra, 152 N.J. at 145, 703 A.2d 927. "DEP must attempt to fulfill both those roles in the context of complex environmental cleanups and a finite source of cleanup funds." Ibid.
The Act "is quite comprehensive in its scope . . .," Dep't of Envtl. Prot. v. Ventron Corp. (DEP v. Ventron), 94 N.J. 473, 496-97, 468 A.2d 150 (1983), and vests DEP with "broad implied powers." In re Kimber Petroleum Corp., supra, 110 N.J. at 74, 539 A.2d 1181. It is also "consistent with the long-standing principle that the Legislature may prohibit activities that constitute a nuisance." DEP v. Ventron, supra, 94 N.J. at 494, 468 A.2d 150. See also Dep't of Transp. v. PSC Res., Inc., *353 175 N.J.Super. 447, 459, 419 A.2d 1151 (Law Div.1980) ("Torts against the environment find their origin in the law of nuisance and trespass.") In fact, the Act has been viewed as a codification of the common law cause of action in nuisance, under which "the State has the right to obtain damages for an injury to public resources or the environment." Ohaus v. Cont'l Cas. Ins. Co., 292 N.J.Super. 501, 509, 679 A.2d 179 (App.Div.1996) (citing Lansco, Inc. v. Dep't of Envtl. Prot., 138 N.J.Super. 275, 283, 350 A.2d 520 (Ch.Div. 1975), aff'd o.b., 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977)). Indeed, our Supreme Court has held that the Spill Act did "not so much change substantive liability as it establishe[d] new remedies for activities recognized as tortious both under prior statutes and the common law." DEP v. Ventron, supra, 94 N.J. at 499, 468 A.2d 150. And in this respect, DEP claims that one of these remedies is the State's right to recover for the "loss of use" of natural resources injured or destroyed by a discharge, a claim embodied in both agency regulations and policy directive. In assessing DEP's claim, we are mindful not only of the Legislature's explicit directive that "[t]his act, being necessary for the general health, safety, and welfare of the people of this State, shall be liberally construed to effect its purposes," N.J.S.A. 58:10-23.11x (emphasis added); see also In re Kimber Petroleum Corp., supra, 110 N.J. at 74, 539 A.2d 1181; Metex Corp. v. Fed. Ins. Co., 290 N.J.Super. 95, 114, 675 A.2d 220 (App. Div.1996), but also our own longstanding tradition of deferring, where appropriate, to an agency's interpretation of its authority. In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 451-52, 608 A.2d 288 (1992); Lower Main St. Assocs. v. N.J. Hous. & Mortgage Fin. Agency, 114 N.J. 226, 236, 553 A.2d 798 (1989); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 69-70, 389 A.2d 465 (1978).
Governed by these principles, we conclude DEP's construction is supported by the text of the statute. As noted, the Spill Act provides for strict joint and several liability, without regard to fault, "for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1). "Cleanup and removal costs" are specifically defined in the Spill Act as:
all direct costs associated with a discharge, and those indirect costs that may be imposed by the department pursuant to [N.J.S.A. 58:10B-2.1] associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including, but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources, and shall include costs incurred by the State for the indemnification and legal defense of contractors pursuant to [N.J.S.A. 58:10-23.11f8 et seq.]
[N.J.S.A. 58:10-23.11b (emphasis added).]
Thus, the definition of "cleanup and removal cost" includes costs "incurred" to "mitigate damage to the public . . . welfare." To "mitigate" means "[t]o make less severe or intense." Black's Law Dictionary 1023 (8th ed.2004). "Mitigation" is a term used in related areas of DEP regulation, as for instance in the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, which provides for compensation *354 for the loss or disturbance of wetlands. See N.J.S.A. 13:9B-13; -21c. Likewise, DEP's Policy Directive explicitly states a preference "for the performance of restoration work and resource protection in lieu of payment of money damages," and in so doing, has adopted a "forward-looking" approach seeking natural resource improvements to make up for historical lost use, instead of a "backward-looking" settlement of a dollar judgment owing. In fact, the Policy Directive specifically suggests that responsible parties, such as defendant, might alleviate the effects on the public of the loss of use of natural resources by providing "substitute resources or resource services" which could be "both in-kind and out-of-kind." Since, according to the Policy Directive, those substitutes "must bear a nexus to the injured resource and should be in the same watershed," it is not unreasonable to conclude that if DEP ultimately proves injury to the public's use of natural resources in the area, the types of "remedies" DEP identified in its Policy Directive could indeed lessen the severity or intensity of those public injuries by replenishing the natural resources of the area, even if the actual natural resources lost cannot be restored or replaced. Thus, the approach taken in DEP's Policy Directive, and implemented in this case, is one that seeks to have responsible parties "mitigate damage to the public health, safety, or welfare" within the meaning of N.J.S.A. 58:10-23.11b. Such "loss of use" damages, we conclude, are a component of costs of mitigating damage to public natural resources.
Defendant nevertheless argues that because N.J.S.A. 58:10-23.11g(c)(1), the only section of the Spill Act imposing strict liability directly against polluters, does not expressly mention "loss of use" damages, then DEP is without authority to seek such relief thereunder and that its removal costs are limited to those incurred under the ACO. We disagree. The Spill Act vests DEP with broad implied powers. In re Kimber Petroleum Corp., supra, 110 N.J. at 74-75, 539 A.2d 1181. And "if such a power is implied, it is just as effective as if it had been expressed." E.I. du Pont de Nemours & Co. v. Dep't of Envtl. Prot. and Energy, 283 N.J.Super. 331, 341, 661 A.2d 1314 (App.Div.1995). Moreover, given the obvious remedial purposes of the statutory scheme, N.J.S.A. 58:10-23.11v, defendant's insistence on such a strict interpretation, which leaves the public less than whole for its loss, is unwarranted.
Rather, lending the Act an expansive reading necessary to accomplish its goals, Metex Corp., supra, 290 N.J.Super. at 114, 675 A.2d 220, the definition of "cleanup and removal costs" is sufficiently broad to encompass DEP's power to assess damages caused to natural resources and to require compensation for their loss of use. Indeed, "[t]he definition of cleanup and removal costs is broad and consistent with the broad authority granted [DEP] under the Spill Act." E.I. du Pont, supra, 283 N.J.Super. at 342, 661 A.2d 1314 (internal quotation marks omitted). The term has been interpreted to include administrative oversight costs, id. at 341, 661 A.2d 1314; the costs of legal services necessary to remediate an environmental insult, In re Thomas, 278 N.J.Super. 580, 585-86, 651 A.2d 1063 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995); and the costs of natural resource physical restoration, In re Kimber Petroleum Corp., supra, 110 N.J. at 85, 539 A.2d 1181, even though none of these has been expressly articulated in the Spill Act's liability provision.
Nothing in Analytical Measurements, Inc. v. Keuffel & Esser Co., 843 F.Supp. 920, 931 (D.N.J.1993), on which defendant relies, is to the contrary. That case involved claims by the property owner and *355 her tenant, who had been held liable to DEP for Spill Act cleanup and removal costs, against a prior owner for contribution damages including the loss of a real estate contract, diminution in property value, and attorney's fees and other fees for defending the contract rescission suit, as well as investigating and overseeing the cleanup, coordinating with DEP, and defending the penalty action brought by DEP. Ibid. In denying relief, the court noted that nothing in the legislative history indicated an intent "to expand the right of contribution under the Spill Act to include other expenses or damages." Ibid. That holding simply does not address DEP's authority to recover damages for the loss of use of natural resources.
In any event, in discerning the breadth and scope of "cleanup and removal costs," N.J.S.A. 58:10-23.11b should not be read in isolation, but as part of the statutory scheme as a whole. See State v. Mortimer, 135 N.J. 517, 536, 641 A.2d 257, cert. denied sub nom. Mortimer v. New Jersey, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994); State v. Angelo's Motor Sales, 125 N.J.Super. 200, 207, 310 A.2d 97 (App.Div.1973), aff'd sub nom. State v. Parmigiani, 65 N.J. 154, 320 A.2d 161 (1974). In other words, all parts of the statute should be harmonized to give effect to the Act's overall meaning and purpose. See DePalma v. Bldg. Inspection Underwriters, 350 N.J.Super. 195, 222-23, 794 A.2d 848 (App.Div.2002). Integrated as such, we are satisfied that other provisions of the Spill Act reinforce the DEP's inclusive interpretation.
For instance, in addressing the obligations of the Spill Fund, N.J.S.A. 58:10-23.11g.a identifies the types of "cleanup and removal costs" that may be sought from the Spill Fund, which in turn may pursue its subrogation rights against the polluter under N.J.S.A. 58:10-23.11u.b. Both provisions are structurally similar and have corresponding language. Thus, pursuant to section 11g, DEP may go forward with "restoration" using Spill Fund monies, N.J.S.A. 58:10-23.11g.a(2), and thereafter, pursuant to section 11u.b, may bring an enforcement action seeking reimbursement from responsible parties, which includes
the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge[.]
[N.J.S.A. 58:10-23.11u.b(4).]
These provisions were among the new sections added by L. 1990, c. 75, § 1 enacted, interestingly enough, in the wake of the 1990 rupture of defendant's interrefinery pipeline connecting its Bayway and Bayonne refineries.[4] The Senate Environmental Quality Committee Statement to that amendment (reprinted at N.J.S.A. 58:10-23.11u), notes that the substitute bill being reported "authorizes recovery in a civil or civil administrative action of compensatory damages for injuries to persons and damages to property, wildlife, and natural resources, and the replacement thereof." As evidenced by the clear language of the amendment, by enhancing DEP's enforcement authority, the Legislature intended to expand, not contract, the agency's abilities to recover compensatory damages from polluters.
Defendant instead focuses on the "where practicable" clause in both provisions, arguing that the Legislature could not have contemplated that restoration costs include compensatory restoration monies, because *356 payment of money is always "practicable". The argument is unconvincing. As DEP's Policy Directive on natural resource damages reflects, loss of use damages may not always be synonymous with monetary compensation, but rather contemplates an array of options including substitute resources or resource services that, depending on the circumstances, may not always be a practicable remedy.
In any event, it is difficult to reconcile defendant's constricted interpretation with its concession that the cost of physical restoration is a "cleanup and removal cost" under the Spill Act. See In re Kimber Petroleum Corp., supra, 110 N.J. at 85, 539 A.2d 1181. Yet, if the term restoration, by all accounts, applies to the natural resource, no sound reason has been advanced why it should not also be deemed to apply as well to the value, use or benefit that the natural resource provides. Otherwise, if recoverable damages are limited merely to physical restoration, the amount of compensation would have no relation at all to the period of lost use. Such a limiting view of DEP's authority not only fails to make the public whole for its loss, but creates a disincentive for polluters to undertake timely remedial action. It is, simply put, inconsistent with the purpose and obvious meaning of the Act. We conclude therefore that "restoration and replacement" requires the return of natural resources to their pre-discharge condition and the replacement of natural resource "services" lost in the interim.
Despite defendant's argument to the contrary, the Act's definition of "remediation" in N.J.S.A. 58:10-23.11b, which specifically exempts natural resource damages, does not detract from this reasoning. The exemption simply does not apply to the broader meaning associated with "cleanup and removal costs".
As noted earlier, "remediation" to risk-based standards is different from "restoration" of natural resources to pre-discharge conditions (primary restoration) or "replacement" of the ecological services and values lost through compensation (compensatory restoration). Remediation, then, is just one of the processes covered by the broad definition of "cleanup and removal costs", a more restricted and technical term, whose language of limitation first appeared in the Spill Act in 2001 as part of the amendments approved in L. 2001, c. 154, and which was actually imported from other legislation with a different focus and purpose.
In this regard, the definition of remediation was first enacted in the Industrial Site Remediation Act (ISRA), L. 1993, c. 139, N.J.S.A. 13:1K-6 to -14, which supplanted the Environmental Cleanup Responsibility Act (ECRA), L. 1983, c. 330, and was later amended by the Brownfield and Contaminated Site Remediation Act (Brownfield Act), L. 1997, c. 278, N.J.S.A. 58:10B-1 to -31. Unlike the Spill Act, where liability is triggered by a discharge and imposed on the discharger, ECRA (and later ISRA), in an attempt to ensure that contamination is discovered and dealt with when funds are available, required that the seller of an industrial property (or the company seeking to close its business) had to investigate and remediate if contaminants were found. That law, however, led to abandonment of industrial properties, so the Brownfield Act was passed to encourage investment in, and development of, those properties by affording relief from natural resources damages liability. Thus, the exception from "payment of compensation for damage to, or loss of, natural resources" in the definition of "remediation" is meant to shield new investors and developers who undertake to clean up problem sites, and not those *357 entities responsible for the initial discharge and resultant pollution. As its legislative history makes clear:
The substitute would also clarify that "remediation" does not include the payment of compensation for damages to, or loss of, natural resources. Therefore, a person who is not a responsible party and therefore eligible to receive a covenant not to sue, would not be liable for the payment of natural resource damages.
[Senate Environment Committee Statement to SCR 2345, L. 2001, c. 154, § 5.]
We are therefore satisfied that the term "remediation" in this context focuses on the type of property cleanup to be undertaken by new investors under the Brownfield Act, and not the original property owner (or successor in interest), who is a "responsible party" for pollution of a site, not protected by the statutory shield.
Any lingering doubt about the inclusiveness of "cleanup and removal costs" is dispelled not only by the Legislature's failure to interfere with DEP's uniform and long-continued construction of the Spill Act, see Med. Soc'y v. Dep't of Law & Pub. Safety, 120 N.J. 18, 25-26, 575 A.2d 1348 (1990); Malone v. Fender, 80 N.J. 129, 137, 402 A.2d 240 (1979), but, quite the opposite, its seeming ratification of the agency's NRD program by recent amendments to the Spill Act. See GATX Terminals Corp. v. Dep't of Environ. Prot., 86 N.J. 46, 53, 429 A.2d 355 (1981); Borough of Matawan v. Monmouth County Bd. of Taxation, 51 N.J. 291, 300, 240 A.2d 8 (1968); Edwards v. Borough of Moonachie, 3 N.J. 17, 24-25, 68 A.2d 744 (1949). In describing the scope of "cleanup and removal costs", these amendments consistently refer to "compensation for damage to, or loss of, natural resources." In our view, in light of the express amendatory language and the obvious legislative intent, the Spill Act allows compensation for the loss of use of natural resources.
In the earliest amendment, L. 2001, c. 154, § 5, as described in the Senate Environment Committee Statement to SCR 2345, the Legislature extended the statute of limitations for civil actions brought by the State pursuant to laws concerning the remediation of contaminated sites or the closure of sanitary landfill facilities and "for the payment of compensation for damage to, or loss of natural resources due to the discharge of a hazardous substance, pursuant to the State's environmental laws." N.J.S.A. 58:10B-17.1b(1). By extending the statute of limitations, the amendatory language reflects a legislative belief that the State has the authority to sue for natural resource damages, including damages for "loss of" natural resources due to hazardous discharges subject to the Spill Act. And in 2005, the Legislature further extended the statute of limitations for natural resource damages liability. L. 2005, c. 245.
Thereafter, in L. 2005, c. 4, the Legislature, in corresponding amendments to both the Spill Act and Brownsfield Act, extended the protection from NRD liability for certain non-polluters who acquired contaminated property after the discharge occurred and who met other conditions. N.J.S.A. 58:10-23.11f22; N.J.S.A. 58:10B-13.1; Assembly Environment and Solid Waste Committee Statement to Assembly, No. 2444. Specifically, the protection afforded included relief from the obligation to pay "compensation for damages to, or loss of, natural resources." N.J.S.A. 58:10-23.11f22. Obviously, the Legislature would not have had to afford non-polluters such liability protection unless the Legislature found them to be otherwise liable for natural resource damages under the Act, specifically, N.J.S.A. 58:10-23.11g.c, and *358 recognized DEP's authority to seek such damages. N.J.S.A. 58:10-23.11f.f.
Most recently, L. 2005, c. 348, an act "concerning protection from contribution suits," amended N.J.S.A. 58:10-23.11f.a(2)(b) to read:
A person who has discharged a hazardous substance or is in any way responsible for the discharge of a hazardous substance who has resolved his liability to the State for cleanup and removal costs, including the payment of compensation for damage to, or the loss of, natural resources, or for the restoration of natural resources, and (i) has received a no further action letter from the State, or (ii) has entered into an administrative or judicially approved settlement with the State, shall not be liable for claims for contribution regarding matters addressed in the settlement or the no further action letter, as the case may be. The settlement shall not release any other person from liability for cleanup and removal costs who is not a party to the settlement, but shall reduce the potential liability of any other discharger or person in any way responsible for a discharged hazardous substance at the site that is the subject of the no further action letter or the settlement by the amount of the no further action letter or the settlement.
[Ibid. (emphasis added).][5]
Unlike the earlier amendment dealing with Brownfield Act new investors, this one applies to polluters or their responsible party successors and affords them protection against contribution suits after they have settled their claims with DEP, including natural resource damages claims.
Once again, as with the earlier amendment, the Legislature would have had no need to extend protection against contribution liability for natural resource damages, including compensation damages for the loss of natural resources, unless the Legislature recognized that settling polluters would otherwise be liable under the Spill Act for such damages. Defendant's contrary argument, that the amendment simply addresses settlements for natural resource damages claims arising under other statutes, is strained. The amendment is to a Spill Act provision, N.J.S.A. 58:10-23.11f(a)(2)(b), and affords protection against contribution suits to those, otherwise subject to Spill Act liability, who have "resolved [their] liability to the State for cleanup and removal costs, including the payment of compensation for damage to, or the loss of, natural resources, or for the restoration of natural resources." Ibid.
Defendant's argument also overlooks the fact that the amendment refers to "compensation for . . . loss of natural resources" in addition to "restoration". N.J.S.A. 58:10-23.11f.a(2)(b); 58:10B-13.1. If, as defendant contends, only damages for physical restoration of a resource is permitted under the Act, the "compensation for damage to or loss of" language contained in the amendatory provisions would be unnecessary and meaningless. Clearly, it is not proper statutory construction to reach a result that would render a provision completely meaningless. See, e.g., Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969). Stated another way, after a responsible party is ordered to pay primary restoration damages, the only residual uncompensated aspect *359 of the injury and, therefore, what the Legislature intended to address by adopting "compensation for damage to, or loss of" language, may reasonably be regarded as the compensatory restoration damages that the DEP now seeks.
We find in these statutory amendments a clear legislative recognition of DEP's authority to seek compensation not just for physical injury to natural resources, but also for the loss of the benefits they provide. We deem it significant that the Legislature amended the Spill Act after DEP's adoption of the Policy Directive, with changes that obviously reflect not only the Legislature's awareness of the agency's natural resource damages initiative, but as well that body's approval of DEP's interpretation of its regulatory powers under the Spill Act.
To conclude, we find that DEP's claim for "compensatory restoration"  loss of use damages  is consistent with the Spill Act's express terms, is harmonious with legislative intent, and is in keeping with legislative directives articulated in the Act's recent amendments.
Reversed and remanded.
NOTES
[1] According to DEP, since inception of the NRD program, responsible parties often come to the agency with restoration plan proposals or seeking suggestions for restorations. Since 2002, DEP had executed voluntary settlements for natural resource damages covering approximately 1500 sites. Along with restoration efforts that predated the 2002 program, these settlements had resulted in preservation of more than 5200 acres for wildlife habitat and aquifer recharge areas, and in recovery of approximately $50 million in compensation for the public. Negotiations were underway at that time involving natural resource damage liability claims on 200 additional sites.
[2] See Restatement (Second) of Torts, § 929(1) (1979); Ohaus v. Cont'l Cas. Ins. Co., 292 N.J.Super. 501, 509, 679 A.2d 179 (App.Div. 1996); Lansco, Inc. v. Dep't of Envtl. Prot., 138 N.J.Super. 275, 283, 350 A.2d 520 (Ch. Div.1975), aff'd o.b., 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977).
[3] See, e.g. Water Pollution Act, N.J.S.A. 58:10A-10; Solid Waste Management Act, N.J.S.A. 13:1E-9.
[4] As noted, DEP's 1993 adoption of the Technical Rules included "restoration" of natural resources in the definition of remedial action.
[5] In a floor amendment to this bill, the term "natural resource damages" was replaced with the phrase "the payment of compensation for damage to, or the loss of, natural resources, or for the restoration of natural resources." The floor amendment statement recited that this change was done "for statutory consistency", presumably with the language of earlier amendments just discussed.